In the Matter of E. A. FRETZ COMPANY, INC., Bankrupt.

REPUBLIC NATIONAL BANK OF DALLAS, Appellant,

v.

Carl S. FITZGERALD, Trustee, et al., Appellees.

No. 75–2520.

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1978.

As Modified on Denial of Rehearing March 9, 1978.

Gordon H. Rowe, Jr., Dallas, Tex., for appellant.

Vernon O. Teofan, A. L. Vickers, Dallas, Tex., for Revlon, Inc. et al.

Before BROWN, Chief Judge, HILL and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal presents a flood of interesting questions. The most intriguing issue is whether the Uniform Commercial Code, construed in light of the policies underlying the Bankruptcy Act, permits the use of "floating secured parties" in secured transactions. Under the bizarre facts of this case, we hold that it does not and reverse.

### Diving Into The UCC Sea

On April 3, 1971, E. A. Fretz Co., Inc. (Fretz), a Texas Corporation, executed as "Debtor" three security agreements giving Revlon, Inc. as "Secured Party" a security interest in certain collateral, including all of

Fretz's then or subsequently acquired equipment and inventory and the proceeds therefrom.[1] The purpose of the agreements was to secure the payment of all debts owed by Fretz to Revlon and to present or future affiliates of Revlon and any debt owed by Fretz to others which Revlon may have obtained by assignment or otherwise.[2]

A financing statement signed by Fretz and Revlon was filed with the Texas Secretary of State on April 5, 1971. The statement described the collateral and designated Fretz as the debtor and Revlon—and only Revlon—as the secured party. Revlon's New York address was also included.[3]

On June 30, 1971, Fretz executed and delivered to Republic National Bank of Dallas (Republic) a security agreement giving the bank a secured interest in various collateral, including Fretz's inventory, then existing or subsequently acquired, and all proceeds therefrom. This agreement secured present and future indebtedness of Fretz owed to Republic. A financing statement, signed by Fretz and Republic, describing the collateral and respectively designating Fretz and Republic as debtor and secured party, was filed with the Secretary of State on August 11, 1971.

Prior to completing this transaction, Republic learned of "Revlon's"[4] security interest in Fretz's inventory[5] and the Revlon-Fretz financing statement. Indeed, Republic unsuccessfully attempted to persuade Revlon to subordinate its security interest to the one Fretz would grant to Republic.

On August 23, 1972, Fretz filed a voluntary petition in bankruptcy and adjudication followed. On September 19, Revlon-Realistic Professional Products, Inc. (RR) and Cosmetic Capital Corp. (CC), both wholly-owned subsidiaries of Revlon, assigned their claims against Fretz to Revlon.

1. Appellant Republic National Bank does not challenge the Bankruptcy Judge's findings of fact as being clearly erroneous. Brief at 6. The facts set forth here are essentially those found by the Bankruptcy Judge and affirmed by the District Court.

2. The pertinent provisions of the agreements are as follows:
    1) *All debts,* liabilities, obligations, guarantees, covenants, and duties *owing by Debtor* and/or any of its present and future divisions and affiliates *to REVLON, INC. and/or all of its present and future divisions and affiliates,* of every kind and description (whether or not evidenced by any invoice or note or other instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, *due or to become due, now existing or hereafter arising, including without limitation any debt, liability or obligation owing from Debtor and/or any of its present and future divisions and affiliates to others which REVLON, INC. and /or its present and future divisions and affiliates may have obtained by assignment or otherwise,* further including without limitation, expenses and attorneys' fees chargeable to Debtor's and/or any of its present and future divisions and affiliates account or incurred by REVLON, INC. and/or its present and future divisions and affiliates, whether provided for herein or in any other agreement, and all filing, recording or searching fees paid by REVLON, INC. and/or any of its present or future divisions and affiliates. Any corporation which controls, is controlled by, or under common con-

trol with REVLON, INC. shall be deemed an affiliate of REVLON, INC. Any corporation which controls, is controlled by, or under common control with Debtor shall be deemed an affiliate of Debtor.
    2) All existing and future indebtedness and liabilities of any and every kind or nature, now or hereafter owing by Debtor to Secured Party, howsoever such indebtedness shall arise or be incurred or evidenced.
    Emphasis added.

3. On that date, § 9.402 Tex.Bus. & Com.Code Ann. tit. 1 (Vernon) provided:
    § 9.402. *Formal Requisites of Financing Statement; Amendments*
    (a) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. . . .
    While this section has since been amended, Acts 1973, p. 999, ch. 400, § 5, effective January 1, 1974; Acts 1975, p. 940, ch. 353, §§ 2, 3, effective June 19, 1975, all parties agree that the pre-1974 Texas UCC provisions govern this case. All citations to the Texas UCC will be made to sections in effect prior to the 1974 amendments.

4. See note 16, *infra.*

5. See note 2, *supra.*

Fretz's equipment and inventory were sold pursuant to Court order. Valid liens and encumbrances were to attach to the proceeds of the sale which grossed $106,-115.12. After applying all credits, and excluding interest, collection and attorneys' fees, Fretz was indebted to the following companies which claimed against the proceeds in the amounts shown:

| | | |
|---|---|---|
| (1) Texas Western Financial Corp.[6] | $ | 1,671.87 |
| (2) Revlon, Inc. | | 29,487.92 |
| (3) Revlon-Realistic | | 160,914.95 |
| (4) Cosmetic Capital | | 32,486.97 |
| (5) Republic National Bank | | 22,555.51 |

Revlon, RR, and CC applied for payment of their claims from the proceeds of the sale, asserting perfected security interests under the umbrella of Revlon's April 3, 1971, security agreements with Fretz.[7] The Bankruptcy Judge entered findings of fact and conclusions of law allowing these claims in toto and leaving no proceeds available to pay Republic. Republic appealed to the District Court which affirmed the Bankruptcy Judge's order without opinion, and this appeal followed.

*Floating Secured Parties Are All Wet*

The Bankruptcy Judge concluded that the indebtedness owed by Fretz to RR and CC, which they had assigned to their parent, "was secured by the security interests of Revlon" and perfected by the filing of the Revlon-Fretz financing statement.[8]

▮ Republic recognizes that the UCC clearly contemplates and sanctions floating collateral (after-acquired property of the debtor) and floating debt (future advances).[9] However, the UCC does not, according to Republic, contemplate "floating secured parties," that is, an open-ended class of creditors with unsecured and unperfected interests who, after the debtor's bankruptcy, can assign their claims to a more senior lienor and magically secure and perfect their interests under an omnibus security agreement and financing statement. We agree with Republic.

▮ It is significant that the Bankruptcy Judge did not hold, either as a matter of fact or law, that the two Revlon subsidiaries were secured parties. Nor did he offer any legal explication of how they became entitled to perfected secured status by virtue of their post-bankruptcy claim assignments to Revlon.[10] For reasons to be discussed below, we hold that since the Fretz-Revlon security agreements did not create security interests in favor of RR and CC, they were not secured parties whose interests could be validly perfected by the Fretz-Revlon financing statement. We further hold that the post-bankruptcy assignments of the subsidiaries' claims against Fretz to Revlon were ineffective to create perfected security interests in favor of Revlon-Realistic or Cosmetic Capital.

First, it is clear that Revlon-Realistic and Cosmetic Capital were not "secured parties" to the April 3, 1971 Fretz-Revlon security agreements.[11] The pertinent portions of these contracts provide:

The indebtedness of Fretz to Cosmetic Capital, which has been assigned by Cosmetic Capital to Revlon, is secured by the security interests of Revlon described in finding of fact No. 1 above.

3.

Such security interests were duly perfected by the filing of the financing statement described in finding of fact No. 1(b) above.

---

**6.** Texas Western, which held a first lien on Fretz's inventory and the proceeds thereof, assigned its claim to Revlon on January 2, 1973.

**7.** See note 2, *supra*. Revlon also sought the $1,671.87 owed to Texas Western and covered by the latter's senior lien. See note 6, *supra*. That unchallenged claim is not involved in this appeal.

**8.** The pertinent conclusions of law follow:

1.

The indebtedness of Fretz to Revlon-Realistic, which has been assigned by Revlon-Realistic to Revlon, is secured by the security interests of Revlon described in finding of fact No. 1 above.

2.

**9.** See § 9.204 Tex.Bus. & Com.Code Ann. tit. 1.

**10.** See note 8, *supra*.

**11.** Revlon concedes that its subsidiaries were not secured parties to whom a security interest was granted. Brief of Appellee at 18.

E. A. FRETZ CO., INC. . . . for the purpose of securing the indebtedness herein described and the further consideration of Ten Dollars . . . to it in hand paid by REVLON, INC. . . . whose mailing address is 767 Fifth Avenue, New York, New York, (hereinafter called, in accordance with the terms and provisions of the Uniform Commercial Code—Secured Party).

. . . . .

§ 9.105(9) Tex.Bus. & Com.Code Ann. tit. 1, defines that term:

"Secured party" means a lender, seller or other person *in whose favor* there is a security interest . . . .

(Emphasis added.) Fretz granted a security interest in favor of Revlon only.

■ Moreover, § 9.203(a) Tex.Bus. & Com.Code Ann. tit. 1, states:

. . . [A] security interest is not enforceable against the debtor or third parties unless

\*  \*  \*  \*  \*  \*

(2) the debtor has signed a security agreement which contains a description of the collateral . . . .

Comment 5 to § 9.203 explains that the formal requisites are not only conditions to enforceability but are in the nature of a Statute of Frauds. Thus, the debtor must have signed the security agreement in favor of the secured party. *See Mosley v. Dallas Entertainment Co.,* Tex.Civ.App., 1973, 496 S.W.2d 237. Had Fretz, Revlon, or the Revlon affiliates desired to grant the security interest in favor of Revlon-Realistic and Cosmetic Capital and to have designated them secured parties in the agreements, such a desire would certainly have been simple to accomplish. They did not. No security interest was created in favor of RR or CC. Therefore, they had no interest which was perfected by the Revlon-Fretz financing statement.

■ But assuming for the sake of analysis that there was an interest which could have been perfected, could perfection be accomplished by virtue of the Fretz-Revlon financing statement or by post-bankruptcy assignment? We believe not.

RR and CC were not signatories to, nor were their addresses given on, the financing statement. Thus, the perfection requirements of § 9.402 were not met.[12] *Cf. Strevell-Paterson Finance Co. v. May,* 1967, 77 N.M. 331, 422 P.2d 366, 3 U.C.C. Rep. 1094 (no address of secured party); *In re Carlstrom,* D.Maine, 1966, 3 U.C.C. Rep. 766 (secured party failed to sign); *In re Murray,* D.Ore., 1964, 2 U.C.C. Rep. 667 (one of two secured parties failed to sign).

■ Revlon argues that the Fretz-Revlon financing statement satisfied the purpose of the § 9.402 requirements which is "simply to give notice that the secured party of record may have a security interest in the collateral described and to enable a prudent examiner to ascertain the exact state of affairs through further inquiry." To support this contention, Revlon cited *In re King-Porter Co.,* 5 Cir., 1971, 446 F.2d 722, and *In re Colorado Mercantile Co.,* D.C. Colo., 1969, 299 F.Supp. 55. (Revlon Brief at 16–17.)

We believe that in the context of this case such an argument proves too much. We agree that the cases cited by Revlon and Comment 2 to § 9.402 indicate that "simple notice" is all that is required. However,

[t]he notice itself indicates merely that the *secured party who has filed* may have a security interest in the collateral described.

Comment 2, § 9.402 (emphasis added). "Secured party" is a defined term. It means a party *in whose favor* a security interest is created. The quoted sentence cannot logically be read as though it stated, " . . . secured party, and anyone in the world who subsequently assigned a claim to the secured party without ever filing a proper financing statement, may have a security interest in the collateral described."[13] Just

---

**12.** See note 3, *supra.*

**13.** Had Texas Western not held a perfected senior lien on Fretz's inventory, it would have

such a construction would necessarily follow were we to accept Revlon's contentions.

We believe that in a world of huge conglomerates a construction of the UCC's silence as to "floating secured parties" which would sanction such a weird device is clearly at odds with the "simple notice" requirements of § 9.402. Placing our imprimatur on floating secured parties would undercut "Article Nine's perfection requirement [which] reflects a Code policy against *secret* security." White & Summers, Uniform Commercial Code, § 24–3, p. 868 (1972) (emphasis added). Since the notice requirements are so simple to meet,[14] the Revlon subsidiaries' failure to protect their interests in a timely fashion [15] should not prejudice Republic.

■ The Bankruptcy Judge was apparently impressed with Revlon's argument that since Republic knew of "Revlon's" [16] security interest, the Code's notice requirements and their underlying purpose were satisfied. But knowledge cannot provide a substitute for creating valid security interests and perfecting them in accordance with Code provisions. Treating knowledge as controlling would turn Article 9 on its head. § 9.301(a) Tex.Bus. & Com.Code Ann. tit. 1 reads in relevant part:

[A]n unperfected security interest is subordinate to the rights of

    (1) persons entitled to priority under Section 9.312.

Section 9.312 deals with priorities among conflicting security interests in the same collateral, § 9.312(e) setting forth a first to file rule as to which knowledge is irrelevant.[17] See Comment 1 to § 9.312. Adding knowledge into this formula would in effect rewrite § 9.301 to provide:

[A]n unperfected security interest is subordinate to the rights of persons entitled to priority under Section 9.312 *unless those persons knew of the unperfected security interest.*

Thus, this drastic result would totally undermine the "idea, deeply rooted at common law, of a race of diligence among creditors," Comment 1, § 9.312, which is embodied in the Code.[18]

Moreover, we question the significance and meaningfulness of "knowledge" under the facts of this case. Assume, for example, that a bank is contemplating making a loan and taking a security interest in inventory which will be subject to a senior lien in the same collateral. Assume further that the security agreement between the debtor and the senior secured party covers after-

---

fallen into the hypothetical third-party stranger category we envision here.

14. It is most improbable that [the Code's] sponsors anticipated the extent to which secured credit . . . would be jeopardized by the errors and omissions of secured parties in satisfying the simple requirements of a sufficient financing statement. *Coca-Cola Bottling Plants, Inc. v. Tabenken,* D.Maine, 1970, 7 U.C.C.Rep. 565, 575.

15. Indeed, on October 22, 1971, some two months after the Fretz-Republic financing statement was filed and 10 months prior to bankruptcy, Cosmetic Capital filed a financing statement in the same property covered in the 1971 Fretz-Revlon financing statement on advice of counsel and at the behest of Texas Western. Tr. 40–41, 54; Republic Exhibit 4.

16. Finding of Fact No. 11 reads:
    Prior to obtaining its security interest on June 30, 1971, Republic knew that "Revlon" had a security interest in Fretz's inventory and that it had filed the financing statement described . . . above . . . . [Quotation marks those of the Bankruptcy Judge.]

It is significant that the Bankruptcy Judge was careful not to state that Republic knew of RR's and CC's security interests. As previously stated, the Fretz-Revlon agreements created a security interest only in Revlon, *not* in its subsidiaries.

17. It seems settled under Section 9–312(5) of the Uniform Commercial Code [Tex.Bus. & Com.Code Ann. § 9.312(e) ] that knowledge of a prior unperfected security interest is irrelevant as far as general priorities are concerned, so that the security interest which is first perfected is superior to all subsequently perfected interests.

Comment, Knowledge and Priorities under Article Nine: A Proposed Rule Change in the Race of Diligent Creditors, 47 U.Colo.L.Rev. 467 (1976); Felsenfeld, Knowledge as a Factor in Determining Priorities under the Uniform Commercial Code, 42 N.Y.U.L.Rev. 246, 251 (1967).

18. No one has contended—and with good cause—that either § 9.301(a)(2) or § 9.401(b) (both of which make knowledge relevant) applies here.

acquired property and future advances. At any point in time, the value of the bank's junior secured interest may vary, depending on the amount of future advances made by the senior lienor and the value of property subsequently acquired by the debtor which forms the collateral.

Surely floating debt and floating collateral provide all the uncertainty any creditor should be required to suffer. When floating secured parties are wading in the wings, clairvoyance, not mere knowledge, would be essential. We are unwilling to impose on any junior secured creditor, with knowledge or without, the additional risk that, at a date subsequent to his perfection, any affiliate of the senior creditor or any stranger to it—unnamed as secured parties in a security agreement or a financing statement—could be metamorphosed into senior secured parties by virtue of an assignment "or otherwise," pre- or post-bankruptcy. We also decline to impose upon a junior secured creditor the burden of a frequent check to determine whether any unsecured parties have secretly assigned their claims to a senior secured party whose interest has been perfected. The risk and the burden would disrupt commercial transactions to an unwarranted and unnecessary degree. No reasonable bank would ever make a loan in the wake of so much floating. Fear of floundering on the rocks would be far too great. We believe that at the time a bank makes a loan, it should be secure in the knowledge of a precisely what, and how many, secured parties claim a prior interest in the same collateral. And it should be able to make that initial determination by resorting to financing statements which meet the "simple" § 9.402 standards.

We are unguided in these uncharted waters by the lighthouse of controlling precedent.[19] But we find the reasoning employed in *In re Murray,* D.Ore., 1964, 2 U.C.C.Rep. 667, to be relevant to a situation where debt, collateral *and* secured parties float. In *Murray,* there were two secured parties to a security agreement, and both were listed as such on the financing statement. However, one of the secured parties failed to sign the latter document. In holding that this failure rendered the statement insufficient to perfect the non-signing party's proportionate interest in the collateral, the Court stated:

This presents a question of first impression in this state under the Uniform Commercial Code—Secured Transactions [UCC §§ 9–101 to 9–507]. The general purpose of the Code is to simplify, clarify and modernize the law governing commercial transactions. The above sections dealing with secured transactions comprise a comprehensive scheme for the regulation of security interests in personal property and fixtures. They supersede all previous legislation dealing with such security devices as chattel mortgages, conditional sales, trust receipts, factor's liens and assignment of accounts receivable. They are designed "to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty."

Under the Code a merchant with a simple signed security agreement may create a general floating lien for present and future advances on his inventory, equipment and running accounts receivable. With such a simple agreement in existence the secured party may leave the merchant in full control of his business and yet be protected against all other creditors by filing with the Secretary of

---

19. We have considered many cases decided under UCC § 9–402 and other relevant sections and find no precedent which would lead us to a different result. *E. g., In re Cushman Bakery,* 1 Cir., 1975, 526 F.2d 23, *cert. denied,* 1976, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178; *In re Fried Furniture Corp.,* E.D.N.Y., 1968, 293 F.Supp. 92, *aff'd per curiam,* 2 Cir., 1969, 407 F.2d 360; *In re Amex-Protein Development Corp.,* 9 Cir., 1974, 504 F.2d 1056; *Avco Delta Corp. Canada Ltd. v. United States,* 7 Cir., 1972, 459 F.2d 436; *see also* Hillman, Article 9 Documentation: Pathways and Pitfalls, 81 Commercial L.J. 468 (1976) and cases cited therein. *Cf.* Comment, The Effect of Errors and Changes in the Debtor's Name on Article Nine Interests, 1975 Duke L.J. 148.

State and the County Clerk a financing statement. Such a statement "is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral." [UCC § 9–402(1)].

\* \* \* \* \* \*

Thus we find the financing statement filed in this case, on a form approved by the Secretary of State, is deficient in one of the few formal requisites in that one of the secured parties did not sign it as required by the statute.  .  .  .

At first glance it may appear that the referee's interpretation is too technical. However, one must recall that the court is interpreting a statute that sweeps away all the technical requirements of a duly prepared and recorded chattel mortgage *on a fluctuating stock of merchandise.* No longer is it necessary to file a duly executed and acknowledged chattel mortgage containing all the decisional safeguards to maintain the validity of the security on a fluctuating stock of merchandise. Nor is it required that notice be given of the amount of the indebtedness secured, or the terms and maturity of payment. *The financing statement when filed stands for five years as notice to the world that the secured party or parties may have a security interest in a stock of merchandise the amount and terms of which may be ascertained only by inquiry of the secured parties.* [UCC § 9–403(2)]. *One secured party may have been paid off, but the other one may be still claiming security. Also the amounts of the loan and terms of payment may be varied from time to time and still be* *protected by the original financing statement.*

Six months before the expiration of the five year effective period of the filed financing statement, its effectiveness may be continued for another five years by the filing of a continuation statement. It must identify the original statement by file number and state that the original statement is still effective. It must be signed by the secured party(ies) but the signatures of the debtors are not required. Thus the significance of the requirement of the signatures of the secured creditors on the original statement is re-emphasized.

*When the state legislature swept away all statutes and judicial precedents concerning secured transactions in personal property, tangible and intangible, existing and future acquisitions, it never intended that the simpler requirements could be ignored. The process of simplification of statutory procedures does not give license to omit one of the simpler requirements.*

It is true that the legislature did provide in [UCC § 9–402(5)] that:

"(5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

Obviously this pertains to minor errors in the contents of the statement and does not relate to one of the formal requisites of a financing statement such as the signatures of the secured parties.

2 U.C.C.Rep. at 668–70 (emphasis added). We believe this reasoning applies with much greater force to the case before us where neither RR nor CC was a secured party under the security agreement or a signatory to the financing statement.[20]

---

**20.** Another Court reaching the same result under similar circumstances offered a further reason for enforcing the technical requirements of UCC § 9–402:

The signature requirement of § 9–402 does not nor was it intended to enhance the quantum but rather the quality of the notice afforded by the filed financing statement. It ought not be assumed that the legislature acted unreasonably in sacrificing increased simplicity in favor of authenticity in the notice filing system. Not only does the new filing system minimize the availability of public information and increase the burden of inquiry on interested third persons, it eliminates some of the safeguards to authenticity

Our view on this score is further reinforced by § 9.302(b) Tex.Bus. & Com.Code Ann. tit. 1, which reads:

(b) If a *secured party* assigns a *perfected* security interest, no filing under this Chapter is required in order to continue the perfected status of the security interest against creditors of and transferees from the original debtor.

(Emphasis added.) Adoption of Revlon's contentions would be tantamount to holding that RR and CC could fit within § 9.302(b). Such a result would render meaningless Article 9's definition of "secured party" and its perfection requirements.

■ The consequences of the decision below are even more disturbing when viewed in light of the Bankruptcy Act.[21] Priority in bankruptcy is determined as of the date of bankruptcy, in this case, on August 23, 1972. 3A Collier on Bankruptcy ¶ 64.02[7]. At that time, neither subsidiary had assigned its claim against Fretz to Revlon. If Revlon "owned," by virtue of the Fretz-Revlon agreement, Fretz's indebtedness to its affiliates such that a security interest to secure that debt was created in favor of Revlon *ab initio* and perfected when the Fretz-Revlon financing statement was filed,

the assignments were pure surplusage.[22] The security agreements purported to secure the debt Fretz owed the Revlon affiliates. As we have held, the Revlon affiliates did not acquire a perfected security interest in the collateral when the Fretz-Revlon financing statement was filed. The intervention of the debtor's bankruptcy before the assignment truncated any possible transformation of unperfected, unsecured interests into perfected secured interests.[23] Otherwise, the policies of the Bankruptcy Act would be greatly disserved.

If a senior secured party to a security agreement could, via post-bankruptcy assignment, secure and perfect under the umbrella of prior omnibus arrangements the claims of subsidiaries and strangers (general or unperfected secured creditors), the potential for inequality, and, indeed collusion or fraud, would be enormous. Sanctioning such transactions would truly create "strangers in paradise" violative of a cardinal principle of bankruptcy law. As has been pointed out:

A prime objective of any scheme for dealing with financially embarrassed estates or persons is equitable distribution of assets to creditors. This is true whether the estate is administered in probate,

which many earlier statutes required, such as acknowledgements, witnessing and affidavits. It seems probable that the consensus among Code draftsmen deemed signatures as indispensable a concession to authenticity as addresses and a general collateral description were to the notice requirements of the new system. There has resulted what might be described as a system of authenticated notice filing.

Signatures are a simple and reliable means of linking the signatories to fraud or of exposing them to liability for failure to comply with statutory and contractual duties or for damages caused by inaccurate or "greedy" filing. Because of the probative value of signatures there is some deterrent effect inherent in any requirement that signatures be affixed on documents available for public inspection as a prerequisite to validity. It follows as a matter of course that where the probative value of a signature is lacking so also is its deterrent effect.

*In re Carlstrom*, D.Maine, 1966, 3 U.C.C. Rep. 766, 771.

The 1974 amendment to § 9.402, see note 3, *supra,* eliminated the secured party signature requirement. Taking its place is the require-

ment that the secured party's name be set forth on the financing statement.

21. "It is often said that the acid test of a security interest is in the debtor's bankruptcy." Henson, Secured Transactions § 7–1, p. 156 (1973).

22. Clearly the assignments were necessary. Prior to assignment, how could Revlon have had a lien to secure debt not owed directly to it?

23. Neither the Bankruptcy Judge nor Revlon has explained to our satisfaction precisely how (by abracadabra, sleight of hand, baptism or otherwise?) this perfected secured status arose. Mystical, magical miracles are rare, even in Texas. The naked conclusion that the indebtedness of the Revlon subs was secured by their parent's security interest does not hold water; it simply avoids the real question of how the transmutation could have occurred within the terms of the UCC. Moreover, we know of no Code provision which would sanction perfection of a nonexistent security interest by assignment, pre- or post-bankruptcy.

or the person's assets are dealt with under common law assignment, receivership, state insolvency statute, or the Federal Bankruptcy Act. Different methods of distribution may, of course, approach similar problems from different angles and in many cases arrive at different results. There is no one immutable principle of what is equitable. Yet the final goal remains the same: a distribution that is equitable to the debtor to the creditor and among the creditors. That "the theme of the Bankruptcy Act is equality of distribution" is a fundamental and long recognized principle.

This general theory underlying the Bankruptcy Act is not difficult to grasp if a few general principles are borne in mind. First, the liquidation provisions of the Act (§§ 1–72) aim at distribution of the bankrupt's unencumbered assets (except exempt property) among his general, unsecured creditors, with certain of these creditors given a priority. On determining what shall be regarded as unencumbered assets and who are the general creditors, the Act must, of course, fix upon a time when the estate of the bankrupt is considered subject thereto and the rights and status are fixed of those claiming against the estate and those against whom the estate claims. The general time pivotal, or point of cleavage, is the "date of bankruptcy," *i. e.,* the date when the petition in bankruptcy, voluntary or involuntary, is filed. But it is *obvious* that, if the creditors and debtor could deal with impunity with the debtor's assets *up to the date of bankruptcy,* only tag ends and remnants of unencumbered assets would too often remain. Bankruptcy liquidation would be futile procedure. The Act, therefore, must necessarily invalidate certain transactions that have occurred prior to bankruptcy. . .

3 Collier on Bankruptcy ¶ 60.01, p. 743 (footnotes deleted). These same principles apply *a fortiori* to post-bankruptcy transactions.

*Waterloo*

Nothing said herein should be construed to affect the valid claim of Revlon, Inc. (claims 1 and 2 set forth in text at note 6, *supra*) for the debt owed to it and Texas Western. Revlon-Realistic (claim 3) does not have a valid lien on the proceeds. Cosmetic Capital (claim 4) does not have a lien on the proceeds superior to Republic's. We express no opinion on whether Cosmetic Capital's filing of a financing statement subsequent to the filing of the Fretz-Republic financing statement entitles it to any part of the proceeds once Republic's claim is paid. Republic's application (claim 5) for payment from the proceeds should be granted.

REVERSED and REMANDED.