In re GOODMAN INDUSTRIES, INC.
American Aluminum Window
Corp., Debtors.

John L. WHITLOCK, Trustee of Goodman
Industries, Inc. and American Aluminum
Window Corp., Plaintiff,

v.

MAX GOODMAN & SONS REALTY,
INC., Shawmut Credit Corp., Philip
Goodman and Jeffrey Goodman, Defendants.

Bankruptcy Nos. 81–0869–HL,
81–1037–HL.
Adv. No. 81–0867.

United States Bankruptcy Court,
D. Massachusetts.

June 21, 1982.

Richard C. Heidlage, Carol J. Kenner, Herrick & Smith, Boston, Mass., for plaintiff.

William F. McCarthy, Ropes & Gray, Boston, Mass., for defendant Max Goodman & Sons Realty.

Charles Bennett, Riemer & Braunstein, Boston, Mass., for defendant Shawmut Credit Corp.

## MEMORANDUM ON COMPLAINT AND COUNTERCLAIMS

HAROLD LAVIEN, Bankruptcy Judge.

This proceeding centers around the relationship between the Debtor corporations and the Defendant, a related real estate company, Max Goodman & Son Realty, Inc. (Realty). Defendant, Shawmut Credit Corporation (SCC), was the Debtor's major secured lender.

Since some of the finding of facts will be more relevant if they are discussed in the various counts, the following facts are briefly stated. American Aluminum Window Corporation (American) was a wholly owned subsidiary of Goodman Industries, Inc. (Goodman). Goodman was owned by Philip Goodman (51%) and his children, Jeffrey Goodman (43%) and Ellen Tangier (6%). Goodman was a manufacturer of aluminum doors and windows. American was one of four subsidiaries that functioned as a sales entity for Goodman. Realty is equally owned by Philip Goodman and his father, Max Goodman. Realty owned the commercial premises which was the Debtors' principal place of business. The Debtors had leased the premises from Realty since 1953.

In August of 1977, SCC and Goodman entered into a Collateral Revolving Loan and Security Agreement. SCC provided a line of credit to Goodman and its subsidiaries and a $200,000 term loan to Goodman for machinery and equipment. SCC received a security interest in Goodman's inventory and accounts receivable and, by a supplementary security agreement, a security interest in its machinery and equipment. Goodman and its subsidiaries all delivered to SCC guarantees of the obligations of each of the others.

On March 10, 1978, Goodman executed and delivered to Realty a five-year term promissory note in the principal amount of $305,523.41 (first note). The proceeds of the first note were used by Goodman to satisfy its share of a pre-existing indebtedness under a joint note executed by Goodman and Realty to certain parties, including the heirs of George T. Goodman.

On March 20, 1978, Goodman executed another note in the original principal amount of $55,000 (second note). Goodman executed a security agreement pledging all its assets as security to Realty. This security interest contained a dragnet clause within its boiler plate printed form and was subordinate to the SCC security interest.

In March, 1979, Goodman and its affiliates were in need of additional capital. SCC refused to increase the outstanding indebtedness on Goodman's assets alone. The following transaction then took place. Realty borrowed $500,000 from SCC secured by a second mortgage on its property. Realty then advanced the proceeds to Goodman in exchange for Goodman's promissory note to Realty in the amount of $500,000 ($500,000 third note). The $500,000 third note was endorsed payable to the order of and assigned to SCC as additional security by Realty. Goodman used the proceeds of Realty's advance to reduce its outstanding indebtedness to SCC, which then made additional working capital financing available to Goodman. A separate security agreement was not executed nor were separate financing statements filed between Goodman and either Realty or SCC.

On October 10, 1980, Realty and Goodman executed cross-guarantees whereby they each guaranteed the other's debt to SCC. At about the same time, Realty executed and delivered a third mortgage on its property to SCC but no security agreement accompanied Goodman's guarantee.

An involuntary petition under Chapter 7 was filed against Goodman on May 20, 1981. An Order for Relief was entered on June 11, 1981 and American filed a voluntary Chapter 7 on the same day. After the bankruptcy petition was filed, SCC filed a complaint to establish lien, for relief from stay and adequate protection. To resolve

that proceeding, a stipulation among the parties reserving all rights and defenses was filed and approved by this Court's subsequent Order. Pursuant to that stipulation, the Trustee paid SCC $955,818.84 which included payment in full of the $500,-000 note plus interest and costs of collection including attorney's fees on account of SCC's alleged secured claims.

On October 19, 1981, the Trustee filed his complaint naming Realty SCC, Philip Goodman and Jeffrey Goodman as defendants. On October 20, 1981, the Trustee filed a request for a temporary restraining order because he had been informed that Realty had sold its property and he wanted to prevent the Defendants from dissipating the proceeds. The temporary restraining order was granted. On October 27, 1981, the Trustee filed a motion for a preliminary injunction as to the same proceeds. On October 30, 1981, the motion was granted in part enjoining the Defendants from transferring a $400,000 certificate of deposit and a $500,000 note to Realty from the purchasers of the property both held by SCC. In January, the Trustee filed a motion for summary judgment on Counts I, V and VI and the first and second counterclaims which was denied. The matter was brought to trial in February, 1982, and a four-day evidentiary hearing was held.

The parties have submitted over 400 pages of legal memoranda and motions throughout the case. While the amount in controversy is not insignificant and the issues are complicated, the Court wonders whether the ever increasing cost of litigation might move prestigious law firms to set an example by restoring that old Yankee virtue of brevity.

The Trustee's complaint was heard in five counts (five counts having been waived). In Count I, the Trustee seeks to be subrogated to SCC's rights under the $500,000 note and mortgage granted to SCC by Realty. Counts II, III and IV were withdrawn prior to trial. In Count V, the Trustee alleges that this guaranty of October 10, 1980 was fraudulent pursuant to 11 U.S.C. § 548(a)(2) because Goodman was insolvent,

was engaged in business with unreasonably small capital or intended to incur debts beyond its ability to pay as such debts matured.

In Count VI, the Trustee alleges that the $77,925.56 in interest payments made by Goodman to Realty within the year prior to the filing of the involuntary petition were preferential payments pursuant to 11 U.S.C. § 547(b).

In Count VII, the Trustee claims that under the principles of equitable subordination, any debts owed by Goodman or American to Realty should be subordinated to all other allowed unsecured claims, and any security interest held by Realty on those debts should be transferred to the Debtors' estates pursuant to 11 U.S.C. § 510.

In Count VIII, the Trustee alleges that the unsecured creditors are entitled, under the equitable doctrine of marshalling, to be subrogated to the rights of SCC against Realty to the full amount of all Debtors' payments made to SCC.

Counts IX and X have been waived.

Defendant, Realty, denies the allegations of each count of the Trustee's complaint and sets forth three counterclaims. In the first counterclaim, Realty claims that principal and interest on the first note of $305,-523.41 is owed to it. Realty further claims that the note is secured by the March 20, 1978 security agreement since it falls within the dragnet clause. Financing statements were filed in April, 1978. Realty further claims that it is entitled, by virtue of subrogation or similar equitable principles to the benefit of security interests granted to SCC under the revolving loan agreements.

In the second counterclaim, Realty claims that the $500,000 note from Goodman to Realty was a secured obligation. In the third counterclaim, Realty claims that the $55,000 second note is unpaid and is secured under the March 20, 1978 security agreement.

SCC filed an answer. SCC's position throughout the proceeding has been that it is merely a stakeholder.

The counts and counterclaims will be considered in order. Realty sold the real estate and a $400,000 certificate of deposit and a $500,000 purchase money note was pledged as security to SCC to indemnify SCC from any losses pursuant to further orders of this court. Presumably, SCC has no real interest in the outcome since to the extent it is determined that SCC is unsecured and therefore must return any payments to Goodman's Trustee, it would then recover against Realty on the indemnity.

In Count I, the Trustee claims that he should be subrogated to SCC's rights under the note and mortgage which SCC received from Realty to secure the $500,000 loan. The Trustee alleges that he has repaid this debt to SCC pursuant to the October 10, 1980 guarantee. Realty claims that the $500,000 third note from Goodman to it was secured pursuant to two separate outstanding security interests and that this secured position was assigned to SCC. Further, Realty contends that in any event, there should be no subrogation since Goodman is in reality paying its own debt for which Realty was the guarantor.

First, Realty argues that the $500,000 third note was secured under the March 20, 1978, security agreement between Realty and Goodman. The security interest allegedly was granted:

> To secure the due payment and performance of all of the liabilities and obligations hereunder of [Goodman], herein called 'Borrower' to Max Goodman & Sons Realty, Inc., herein called 'Secured Party', and all other liabilities and obligations of Borrower to Secured Party of every name and nature whatsoever, direct or indirect, absolute or contingent, now existing or hereafter arising or acquired, including, without limitation, the due payment and performance of all liabilities and obligations under a promissory note of even date in the amount of Fifty-Five Thousand ($55,000.00) Dollars, all hereinafter called 'Obligations'.

Although this security agreement was executed to cover the $55,000 second note, Realty claims that the $500,000 note was an "obligation" within this dragnet clause and therefore was secured.

Realty's second argument is that by virtue of the assignment of its $500,000 third note from Goodman to SCC, the note became a direct obligation from Goodman to SCC. Realty further argues that this became a secured debt of SCC because the 1977 revolving loan agreement secured all "obligations" from Goodman to Shawmut. "Obligations" was defined in the agreement as follows:

> "Obligation(s)" shall include, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by [Goodman] to Shawmut at any time, each of every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by [Goodman] to Shawmut, or are due indirectly by [Goodman] to Shawmut as endorser or guarantor; or as obligor of obligations due to third persons which have been endorsed or assigned to Shawmut; or otherwise), absolute or contingent, due or to become due, now existing or hereafter contracted. Said term shall include all interest and other charges chargeable to [Goodman] or due from [Goodman] to Shawmut from time to time and all costs and expenses referred to in Paragraph 9 of this Agreement.

Both arguments involve the application of dragnet or boilerplate clauses in security agreements. The first argument applies to the dragnet clause in the March 20, 1978 security agreement from Goodman to Realty. A dragnet clause will not be considered to include future advances "unless the facts reveal that said advances are of the same kind and quality or relate to the original transaction, or unless the new obligation incurred refers or was contemplated by the parties to the mortgage and to have said mortgage be security therefor." *White Star Confectionery Co. v. First Agricultural Bank*, Case No. 330, Pittsfield Division, (Mass.D.Ct.Appellate Division

1982); *John Miller Supply Co., Inc. v. Western State Bank*, 10 U.C.C.R.S. 1329, 55 Wis.2d 385, 199 N.W.2d 161 (1972); *Canal National Bank v. Becker*, 431 A.2d 71 (Me. 1981). The guiding principle in construction of a dragnet clause is the determination of the intent of the parties in view of the particular circumstances and the language employed in the mortgage. *Financial Acceptance Corp. v. Garvey*, 6 Mass. App.Ct. 610, 380 N.E.2d 1332 (1978); *see also Everett Credit Union v. Allied Ambulance Services, Inc.*, —— Mass.App. ——, 1981 Mass.App.Ct.Adv.Sh. 1500, 424 N.E.2d 1142.

■ Applying the above principles to the facts in this case, I find that the parties did not intend that either the first $305,000 note and the third $500,000 note between Goodman and Realty was to be a secured obligation. The proceeds of the $305,000 first note were used to pay off a debt to one of the heirs of Goodman. The $55,000 loan was allegedly for general working capital although Philip Goodman could not remember the purpose for the loan. The $500,000 loan was for working capital. No specific security agreement was executed for the $305,000 first note. This $305,000 note was executed only ten days prior to the $55,000 second note, upon which a security agreement was executed and financing statements filed. Yet, there was no specific reference in the accompanying security agreement to the earlier $305,000 first note. In the Goodman Industries, Inc. Consolidated Financial Statements for years ended January 31, 1980 and 1979, the $305,000 first note and the $500,000 third note are both described as unsecured.[1] The independent certified public accountant who prepared the financial statements testified that he did not examine the actual notes, but rather relied on confirmation letters from Realty.[2] Two confirmation letters were entered into evidence. One letter dated May 2, 1979, was signed by Philip Goodman for Realty and states that the $305,000 first note is unsecured. The other letter was dated March 25, 1980, was also signed by Philip Goodman for Realty and states that both the $305,000 first note and the $500,000 third note are unsecured. In the 1978 and 1979 financial statements, the $305,000 note was represented as unsecured.[3] The $500,000 third note was not executed prior to year end January 31, 1979; however, subsequent event footnote 10 stated that the $500,000 obligation was secured.[4] Fi-

1. Footnote 5 to the 1979–80 financial statements describing long-term debt provided:

| | 1980 | 1979 |
|---|---|---|
| Demand note payable to a related real estate corporation, bearing interest at prime plus 7%, unsecured and subordinated to the note payable – bank (Note 4). The creditors have stated that they will not demand payment within the next year. | $500,000 | $ – |
| 10% note payable to a related real estate corporation, dated March 8, 1978, unsecured, due in five years, with principal payments based on twenty-five year amortization. At the end of the five years, the remaining balance of $287,802 will be due. This note is subordinated to the note payable – bank (Note 4). | $299,988 | $303,121 |

2. A confirmation letter is sent by a lender to the auditor after the auditor has requested the lender to describe or confirm the status of its loans.

3. Footnote 6 to the 1978–79 financial statements describing long-term debt provided:

| | 1979 | 1978 |
|---|---|---|
| 10% note payable – unsecured, to a related real estate corporation, due in five years, with principal payments based on twenty-five year amortization. At the end of the five years, the remaining balance of $287,802 will be due. This note, together with the preceding note were used to repay the note payable to former shareholders, shown above. This note is subordinated to the note payable – bank (Note 4). | $303,121 | – |

4. *Note 10—Subsequent Event*
In March 1979, the Company borrowed $500,000 from a related real estate corporation. The note is due on demand with interest at 7%

nally, Realty executed a subordination agreement in favor of SCC in conjunction with the $500,000 third note transaction. The agreement was signed by Philip Goodman for Realty and specifically states that "the undersigned holds no security therefor." Philip Goodman testified that he always intended for Realty to be secured and that he did not draft the above documents. However, Mr. Goodman did sign the confirmation letters, and the subordination agreement, and he did not object to or seek to correct the financial statements. Mr. Goodman had attended three years of college and was experienced and sophisticated enough to read and understand the documents he signed. In considering all these circumstances, including Philip Goodman's poor memory and his actions rather than his words I find that the parties did not intend that the $305,000 first note and the $500,000 third note between Realty and Goodman were to be secured. *See Hancock County Bank v. American Fletcher Nat. Bank & Trust Co.*, 150 Ind.App. 513, 276 N.E.2d 580 (1971).

■ The issue still remains as to whether the $500,000 third note became a secured obligation owing to SCC by virtue of the assignment by Realty. While the Uniform Commercial Code (UCC) contemplates floating debt, it does not contemplate floating secured parties. *In re E. A. Fretz Co., Inc.*, 565 F.2d 366 (5th Cir. 1978). In that case, the Fifth Circuit rejected the secured party's arguments that claims assigned to it by its subsidiaries were secured by virtue of a dragnet clause covering debts owed to affiliates. Since the affiliates were not signatories to, nor were their addresses given on the financing statement, they failed to meet the perfection requirements of UCC § 9–402. The Fifth Circuit's reasoning for denying the secured status is also applicable in this case:

> Surely floating debt and floating collateral provide all the uncertainty any

creditor should be required to suffer. When floating secured parties are wading in the wings, clairvoyance, not mere knowledge, would be essential. We are unwilling to impose on any junior secured creditor, with knowledge or without, the additional risk that, at a date subsequent to his perfection, any affiliate of the senior creditor or any stranger to it—unnamed as secured parties in a security agreement or a financing statement—could be metamorphosed (sic) into senior secured parties by virtue of an assignment "or otherwise," pre- or post-bankruptcy. We also decline to impose upon a junior secured creditor the burden of a frequent check to determine whether any unsecured parties have secretly assigned their claims to a senior secured party whose interest has been perfected. The risk and the burden would disrupt commercial transactions to an unwarranted and unnecessary degree. *Id.*, at 372.

Goodman's creditors would not be aware of the security claimed by virtue of the assignment. I find that the assignment of the note did not create a direct secured obligation owing to SCC.

If Goodman paid the $500,000 third note owed to Realty and assigned to SCC, as to this note it was merely an unsecured debtor of SCC. On the other hand, SCC was a secured creditor of Realty and Goodman actually paid that secured debt under the guarantee of October 10, 1980. The Trustee requests that he be subrogated to SCC's rights against Realty under its status as guarantor.

■ The Trustee is entitled to be subrogated to SCC's rights in this case. The Trustee paid the money over to SCC pursuant to a stipulation between the Trustee and SCC[5] in an adversary proceeding where SCC was seeking relief from stay. In that proceeding SCC alleged that it was owed money under a number of loan ar-

---

over prime and is collateralized by a security interest in accounts receivable, inventory and fixed assets and is subordinated to the note payable—bank (Note 6). The proceeds are to be used for working capital needs.

5. The Debtor and Realty also assented to that stipulation.

rangements including the October 10, 1980 guarantee by Goodman of all obligations of Realty. Pursuant to that stipulation and Order of the Court, dated June 29, 1981, the Trustee has paid $956,434.88 to SCC from the proceeds of the collection and sale of the Debtors' assets.[6] As of the date of filing, $518,180.09 plus costs and attorney's fees was due to SCC under the $500,000 loan to Realty. The Trustee has paid this debt.

The doctrine of subrogation applies when an entity, not a mere volunteer, pays a debt for which another is primarily liable and which in equity and good conscience should have been discharged by the latter. *See* 10 *Williston on Contracts* § 1265, at 844 (3rd ed. 1967); *Restatement of Security* § 141, Comment a, at 383–84. The Trustee paid Realty's debt to SCC. In equity, where a guarantor is required to pay the obligation of the principal debtor on a note, the guarantor becomes subrogated to the rights of the creditor against the debtor. *See Fisk v. Bower*, 227 Mass. 315, 319, 116 N.E. 568 (1917); *Wall v. Mason*, 102 Mass. 313, 316 (1869).

To the extent that Goodman's guarantee of Realty's debt should be considered to give SCC a secured claim, SCC's primary obligor was Realty. A guarantor makes a contract distinct from the principal obligation and is collaterally liable if the principal fails to perform. 10 *Williston on Contracts* § 1211 at 685 (3rd ed. 1967).[7] Goodman paid the money to SCC as guarantor of Realty's debt. "One who pays another's debt to protect his own rights and interests is not ordinarily a volunteer and may be

subrogated to the creditor's rights." *First National City Bank v. United States*, 548 F.2d 928, 936 (Ct.Cl.1977).

The defendant argues that in actuality Realty was the guarantor for Goodman's debts.

I hold that the equities between the parties require a finding that Realty was primarily liable to SCC and that Goodman's liability came about as a secured debtor (as opposed to SCC's unsecured claim on the assigned note) solely and exclusively because of the October 10, 1980 separate and distinct guaranty of Realty's obligations.

Certainly, as between Realty and Goodman, there can be no question that Realty borrowed the money from SCC and gave its mortgage to secure the debt. SCC had turned Goodman down for the same loan. As between Goodman and Realty there existed only an unsecured obligation. Likewise, the primary secured obligation ran between SCC and Realty. Any obligation of Goodman to SCC was secondary, whether it came from the guaranty of October 10, 1980, which was SCC's contention in its complaint, or even as Realty contended from the assignment of Goodman's note to SCC as security.

While even in equity favored treatment of creditors over stockholders is not in itself justification for subrogation, the subrogation of the Trustee to the rights of SCC will on one side impinge on the advantages to be received by the Goodman family who own the equity interest in both entities while, on the other side, will benefit the third-party creditors. Certainly, as between creditors

---

**6.** This amount includes payment of attorneys' fees which are subject to approval of this Court. SCC has 30 days to file a fee application and affidavit for approval of this Court. It should only be noted that only the fee for collecting the money which according to this decision was due directly from Goodman can be chargeable to Goodman. The balance of any reasonable fee would of course be chargeable to Realty.

**7.** SCC (who probably is not a real party in interest but rather merely a stake holder) states in its answer that under the guarantee as executed, Goodman became a primary obligor to

SCC. The distinction between a guarantor and a surety has sometimes been stated as follows:

Guaranty is distinguishable from suretyship in that the former is a collateral and independent undertaking creating a secondary liability, while the latter is a direct and original undertaking under which the obligor is primarily and jointly liable with the principle. *SNML Corp. v. Bank of North Carolina, N. A.*, 41 N.C.App. 28, 254 S.E.2d 274 (1979). While normally before taking action on a guaranty, the creditor would have to first pursue the primary obligor, this guaranty excluded such a requirement. (Ex. 39).

and equity holders, the Court's sympathy should rest with the creditors when the structure of the transaction that allows that result was the creation of the equity holders. The equity holders chose the format; shielded the full facts in the confirmation letters, financial statements, subordination agreement and negotiations with creditors; and mislead or at least did nothing to correct the misimpression of the creditors as to the security interest of Realty. "(I)t is the duty of the court, especially a court of equity, to adjust the rights of the parties so far as possible so that the ultimate loss shall accord with the equitable position of the parties." 10 *Williston on Contracts* § 1264 at 842 (3rd ed. 1967). That is especially true when the party now complaining that the court should consider the realities and not the form were instrumental in creating the very form of which they now complain. *See Goldfarb v. Marchionne,* —— Mass.App. ——, Mass.App.Ct.Adv.Sh. 1588, 425 N.E.2d 401 (Mass.App.1981).

The Trustee paid Realty's debt out of the funds which should be available to all unsecured creditors. To the extent he has paid Realty's debt, he is entitled to be subrogated to SCC's rights under the note and mortgages. The mortgage property has been sold. Therefore, the Trustee's right to subrogation should attach to those proceeds. The $400,000 certificate of deposit and the $500,000 note from the purchasers of Realty's property that SCC is now holding in escrow should be turned over to the Trustee. The Trustee should liquidate the $500,000 buyer's note in a reasonable manner and take out of the proceeds the balance owed the estate under his right of subrogation. The surplus should be turned over to Realty.

Counts II, III and IV have been waived by the Trustee.

In Count V, the Trustee alleges that Goodman's October 10, 1980 guaranty was made for less than reasonably equivalent value while Goodman was insolvent, and therefore was a fraudulent conveyance under § 548(a)(2) of the Bankruptcy Code.[8] In order to presume fraud under § 548(a)(2) both "less than reasonably equivalent value" and insolvency or resulting insolvency must be present. *See* 4 Collier on Bankruptcy ¶ 548.03 (15th ed. 1981). On the evidence presented, I cannot find that either of these two elements were present. At the same time Goodman executed and delivered its guarantee of Realty's debts, Realty executed and delivered its guarantee of Goodman's debts. No evidence was presented as to the value of Realty's guarantee. However, I can only adduce from hindsight that Realty was probably the more affluent company at the time. Further, the Trustee has not met the burden of proof on the issue of insolvency. Insolvency means that the sum of an entity's debts must be greater than a fair valuation of the entity's assets. *See* 11 U.S.C. § 101(26). Although by September 30, 1980, the consolidated balance sheet of Goodman and its subsidiaries began to show a negative net worth, the Trustee presented no evidence to show whether the balance sheets reflected a fair valuation of the assets. For example, William Smith testified that the fixed assets of Goodman and its subsidiaries were carried at historical cost less depreciation, which value would not relate to the price at which the asset could be sold. The Trustee argues that the inventory was overvalued

---

**8.** § 548(a)(2). Fraudulent Transfers and Obligations.

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(2) received less than a reasonably equivalent value in exchange for such transfer or obligation, and

(B)(i) was insolvent on the date that such transfer was made or such obligation was

incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

as early as May, 1980. James Connors, Goodman's plant supervisor at the time and subsequent President, testified that in April or May, 1980, he did a visual inventory of the Debtors and estimated that there was approximately 1.6 million dollars worth of unusable inventory. However, he also testified that the exact value of the unusable inventory would depend on the disposition of that inventory, i.e., resale or scrap. Mr. Goodman and Mr. Smith similarly testified. I find that reasonable people could have differed as to the value of the inventory and the evidence presented was not sufficient to sustain a finding of insolvency.[9] Finally, the Trustee bases his claim of insolvency of Goodman on the consolidated financial statements. In order to make a determination of insolvency, the Court would need to start from a separate statement of Goodman's assets and liabilities. For these reasons, I find for the Defendant on Count V.

■ In Count VI, the Trustee alleges that the interest payments made by Goodman to Realty on account of the $500,000 third note were made while the Debtors were insolvent within one year of the bankruptcy filing and therefore were a preferential payment under § 547(b).[10] The amount of these payments was $77,925.56. Section 547(b)(3) requires that the Debtor be insolvent in order for there to be a preference. The discussion as to insolvency in Count V disposes of this issue and in fact, I do not find that insolvency was ever proved. However, § 547(e) creates a presumption of insolvency during the 90 days immediately preceding the date of the filing. The Defendant has not presented sufficient evidence to rebut this presumption. Any interest paid within the 90 days of filing was paid on an antecedent debt. Realty will have obviously received more than it would receive in liquidation since a 100% dividend is highly unlikely. Therefore, interest paid within 90 days of the filing is a preference and is recoverable by the Trustee.

■ Realty argues that the payments of interest were made on a timely basis, within 45 days of the time due and so are within the exception provided by § 547(c)(2).[11] Actually, § 547(c)(2) provides an exception to the preference rule if payment was made not later than 45 days after such debt was incurred. A debt is incurred when the Debtor has a legally binding obligation to pay it. R. Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am.Bankr. L.J. 173, 187 (1979). The weight of authority holds that the debt is incurred when the Debtor assumes the obligation and is not

9. Although Connors questioned the status of the inventory in May, it was not until the September 30, 1980 monthly statement that the inventory was written down sufficiently to even show a book negative net worth.

10. § 547(b) provides:
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
 (i) was an insider; and
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11. § 547(c)(2)(A) through (D).
 (c) The trustee may not avoid under this section a transfer—
 (2) to the extent that such transfer was—
 (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
 (B) made not later than 45 days after such debt was incurred;
 (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 (D) made according to ordinary business terms;

incurred anew every month when a payment is due. *Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir. 1981); *In re Iowa Premium Service Co., Inc.*, 12 B.R. 597 (Bkrtcy.S.D.Iowa 1981); *In re McCormick*, 5 B.R. 726 (Bkrtcy.N.D.Ohio 1980); *In re Bowen*, 6 B.C.D. 254, 3 B.R. 617 (Bkrtcy.E. D.Tenn.1980).[12] Long-term credit is not within the § 547(c)(2) exception. *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir. 1981). The records show that only one interest payment of $9,034.33 was made within the 90-day period (Ex. 46). This payment is recoverable by the Trustee.

In Count VII, the Trustee claims that the Debtors and Realty were operated as one economic unit and that all advances by Realty were contributions to capital. He further argues that Realty's claims should be subordinated to all other allowed claims and all of Realty's assets should be included in the bankruptcy estate. Finally, he argues that any security interest held by Realty should be transferred to the estate pursuant to 11 U.S.C. § 510, the provision on equitable subordination. The Trustee argues as a general proposition that the Debtors and Realty were, in reality, operating as a single entity and therefore, all of Realty's assets should be included in the bankruptcy estate. Evidence was presented which showed that William Smith, Goodman's Chief Financial Officer, kept the books and records of Realty in his desk in Goodman's office. While a lease did exist between the two entities, Goodman never made the agreed rental payments but rather paid what was necessary to service Realty's first mortgage. When interest payments were due on the $500,000 loan, Goodman would issue a check to Realty who in turn would issue a check to SCC. Mr. Smith would instruct Goodman's Accounts Receivable Clerk to draft the checks and Goodman's Assistant Credit Manager made the various deposits.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619, 233 N.E.2d

748 (1968) sets forth two standards for determining when separate corporations should be treated as one:

> Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their representatives are acting. *Id.*, at 619, 233 N.E.2d 748.

In this case, there is no evidence of any fraudulent or injurious consequence of the relationship between Realty and Goodman. Further, there was no evidence that any third party was mislead or confused by the separate identities of the two corporations. Although the two corporations were controlled by the same parties, it was clear to Goodman's creditors that Realty was a separate but related real estate corporation, whereas Goodman was a manufacturing company. *Cf. Commodity Futures Trading Comm. v. Comvest Trading Corp.*, 481 F.Supp. 438 (D.Mass.1979) (two corporations functioned as a common enterprise performing the exact same activities).

■ Realty's unsecured claims should not be subordinated to all other allowed claims. I have already found that Realty claims on the $500,000 note and $305,000

---

**12.** For the contra view, *see In re Ken Gardner Ford Sales, Inc.*, 10 B.R. 632, 648 (Bkrtcy.E.D. Tenn.1981).

note are unsecured. The March 20, 1978 note is a valid secured obligation.

 Section 510(c) [13] of the Bankruptcy Code provides that under the principles of equitable subordination, the Court may subordinate all or part of an allowed claim and transfer to the estate any lien securing such a subordinated claim. This section is intended to codify case law, such as *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) and *Taylor v. Standard Gas and Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1938). These principles of case law have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 359. Senate Report No. 95–589, 95th Cong., 2d Sess. (1978) 74, U.S.Code Cong. & Admin.News 1978, p. 5787. The issue before the Court is whether Realty (or its principals) was guilty of misconduct such that its claims should be subordinated. The only evidence of misconduct presented by the Trustee was that Realty's loans have been misrepresented as unsecured in the financial statements. Three conditions must be satisfied before exercise of the power of equitable subordination is appropriate: i) the claimant must have engaged in some type of inequitable conduct; ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977). Since the $500,000 third note and the $305,000 first note are being treated as unsecured, the trade creditors have not been mislead or damaged by any misconduct of Realty.

 An advance to a failing corporation by a dominant shareholder will not be subordinated on that basis alone. *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389 (10th Cir. 1979). Such loans will be subordinated where there is evidence that the initial capitalization of the corporations were grossly inadequate, but here there was no evidence as to initial capitalization and these corporations had been in existence for 25 years. See *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389 (10th Cir. 1979); *In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir. 1977); *In re Sterling House, Inc.*, 356 F.Supp. 1113 (W.D.Va.1973).

In Count VIII, the Trustee argues that under the equitable doctrine of marshalling of assets, SCC should be required to satisfy its claims out of Realty's assets. While there is a conflict as to the treatment of guarantors [14] the prevailing view is that the sine qua non of marshalling is that the senior creditor have access to two funds of a single debtor when only one fund is subject to the claim of a junior creditor. *Meyer v. United States*, 375 U.S. 233, 236, 84 S.Ct. 318, 320, 11 L.Ed.2d 293 (1963); *In re Beacon Distributors, Inc.*, 441 F.2d 547, 548 (1st Cir. 1971); *Broadway National Bank v. Hayward*, 285 Mass. 459, 463, 189 N.E. 199 (1934).

 Although the Trustee argues that Realty and Goodman should be treated as the same entity, I have specifically declined to so find. The facts of this case do not present a compelling equitable rationale for this Court to accept the deviation from the traditional marshalling doctrine of a single debtor that would be required to extend the doctrine to a guarantor. In fact, I found for the Trustee under the doctrine of subrogation, thereby allowing him to recover

**13.** § 510. Subordination.

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

**14.** *In re Clary House, Inc.*, 11 B.R. 462 (Bkrtcy. W.D.Mo.1981) and *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437 (Bkrtcy.N.D.Fla.1980) (marshalling permitted against guarantor as exception to common debtor rule); *contra In re United Medical Research, Inc.*, 12 B.R. 941 (Bkrtcy.C.D.Cal.1981).

from Realty the payments on the $500,000 third note. Although the Trustee would like the balance of SCC's claim to be satisfied out of Realty's assets, the facts of this case do not warrant such a remedy. The balance of the claim owed to SCC was a direct obligation of Goodman to SCC and was in no way related to Realty except for Realty's guarantee of Goodman's obligations to SCC. I find for the Defendant on Count VIII.

Counts IX and X have been waived by the Trustee.

In its first and second counterclaim, Realty claims that it is owed money on the March 10, 1978, $305,523.41 first note and the March 10, 1979, $500,000 third note, that these claims are secured. I have already found that these notes were intended to be unsecured. Therefore, Realty may file an unsecured claim for the balance under these notes.

■ In its third counterclaim, Realty claims money due on the March 20, 1978, the original principal of which was $55,000. A security agreement was signed covering this note and proper financing statements were filed. In its brief, Realty claims that as of January 31, 1980, $140,395 was due on this note. No evidence was presented as to the amount outstanding on this note. Realty is entitled to set off against Goodman's recovery the amount due on this secured claim.

The Trustee is to submit a proposed judgment in keeping with these findings and rulings within ten days. Counsel for Realty will then have five days to object to the form of the judgment and to request a hearing if the parties cannot agree on the amount due on the March 20, 1978 second note originally in the face amount of $55,-000.

SCC shall have 30 days to submit its application for the amount and allocation of its costs and legal fees as per footnote 6.