**PRIDE HYUNDAI, INC., Blackstone Subaru, Inc., d/b/a Pride Hyundai of Seekonk, Pride Dodge, Inc., and Pride Chrysler–Plymouth, Inc., Plaintiffs,**

v.

**CHRYSLER FINANCIAL COMPANY, LLC, Defendant.**

No. CIV.A. 01–412S.

United States District Court,
D. Rhode Island.

May 29, 2003.

Preston W. Halperin, Esq., Thomas E. Carlotto, Esq., Christine L. DeRosa, Esq., Shechtman Halperin Savage, LLP, Providence, RI, for Plaintiffs.

Jonathan D. Deily, Esq., Deily, Dautel & Mooney, LLP, Albany, NY, Thomas W. Lyons, Esq., Strauss, Factor & Lopes, Providence, RI, for Defendant.

## DECISION AND ORDER

SMITH, United States District Judge.

This case concerns the decay of the business relationship between an automobile dealership and its financial lending institution. The dealership, Plaintiffs Pride Hyundai, Inc., Blackstone Subaru, Inc., d/b/a Pride Hyundai of Seekonk, Pride Dodge, Inc., and Pride Chrysler–Plymouth, Inc. (collectively "Plaintiffs" or "Pride")[1] sues the lender, Chrysler Financial Company, LLC ("Defendant" or

---

1. The Pride dealerships are located in Massachusetts and Rhode Island. Amended Stipulations of Fact ("Stips."), ¶¶ 1–4.

"CFC")[2] for tortious interference with prospective contractual relations, breach of the implied covenant of good faith and fair dealing, violation of the Massachusetts consumer protection statute, and declaratory relief. CFC counterclaims for a declaration of its rights and its contractually contemplated attorneys' fees.

This Court held a bench trial on this matter during the week of March 24 through March 28, 2003, and heard closing arguments on April 2, 2003. The parties also filed post-trial submissions on April 16, 2003.

After considering the extensive factual stipulations, live witness testimony, two volumes of exhibits, and the parties' oral and written legal arguments, the Court finds that the Plaintiffs' allegations constitute neither a breach of the covenant of good faith and fair dealing, nor a tortious interference with prospective contractual relations, nor a violation of Mass. Gen. Laws ch. 93A, the Massachusetts consumer protection statute. Furthermore, the Court finds against Plaintiffs on their request for declaratory relief pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57. Finally, the Court finds in favor of Defendant on its counterclaim for declaratory relief. The Court reserves judgment at this time on Defendant's request for its attorneys' fees and expenses. Accordingly, as set forth below, judgment shall enter (1) against Plaintiffs, and (2) for Defendant.

2. CFC is a Michigan limited liability company, and has been merged into DaimlerChrysler Services North America LLC ("DaimlerChrysler Services"). Stips., ¶ 5.

3. There is a separate Security Agreement and Master Credit Agreement between CFC and each of the Pride entities in this case. *See* Stips., ¶¶ 7–9.

4. The termination and withdrawal of these UCC filings lie at the heart of this case. *See* Mass. Gen. Laws § 9–404(1) (the provision

I. *Findings of Fact*

1. *The Legacy of the Relationship*

In order to set the stage for a discussion of the early business relationship of the parties, it is necessary briefly to explain the nature of and distinctions between the two species of automotive contract that govern this case.

a. *Wholesale Financing Agreements*

A wholesale financing agreement enables a lender to provide automobile inventory financing (sometimes denominated "floor plan financing") to a dealer, so that the dealer can acquire automobile inventory. Here, this type of agreement is the so-called Security Agreement and Master Credit Agreement.[3] This agreement requires that CFC properly perfect its security interest in Pride's property (*i.e.*, the automobiles) by filing Uniform Commercial Code ("UCC") Financing Statements with the Commonwealth of Massachusetts and the State of Rhode Island, as appropriate.[4] *See* Stips., ¶ 10. The Security Agreement and Master Credit Agreements contain expansive language that plainly collateralizes all of Pride's obligations to CFC:

> 3.0 *Security*—.... The security interest hereby granted shall secure the prompt, timely and full payment of (1)

applicable to this case, recodified as amended in 2001 at Mass. Gen. Laws ch. 106, § 9–513); R.I. Gen. Laws § 6A–9–404, which provides:

> Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party shall, not later than thirty (30) days after the secured obligation has been satisfied, send to the Secretary of State a termination statement....

*Id.* (recodified as amended at R.I. Gen. Laws § 6A–9–513 in 2001).

all Advances, (2) all interest accrued thereon in accordance with the terms of this Agreement and the Promissory Notes, (3) all other indebtedness and obligations of Debtor [Plaintiffs] under the Promissory Notes, (4) all costs and expenses incurred by the Secured Party [Defendant] in the collection or enforcement of the Promissory Notes or of the obligations of the Debtor under this Agreement, (5) all monies advanced by Secured Party on behalf of Debtor for taxes, levies, insurance and repairs to and maintenance of any Vehicle or other collateral, and (6) each and every other indebtedness or obligation now or hereafter owing by Debtor to Secured Party including any collection or enforcement costs and expenses or monies advanced on behalf of Debtor in connection with any such other indebtedness or obligations. . . .

Exs. 6–9.[5] The parties term this provision the "Dragnet Clause." Further evidence of fully integrated collateralization exists in the following provision:

6.0 ***Events of Default and Remedies/Termination***—. . . Secured Party may terminate the [Security Agreement and Master Credit] Agreement, refuse to advance funds hereunder, and declare the aggregate of all Advances outstanding hereunder immediately due and payable upon the occurrence of any of the following events . . . and that Debtor's liabilities under this sentence shall constitute additional obligations of Debtor secured under this Agreement.

(a) Debtor shall fail to make any payment to Secured Party, whether constituting the principal amount of any Advance, interest thereon or any oth-

er payment due hereunder, when and as due in accordance with the terms of this Agreement or with any demand permitted to be made by Secured Party under this Agreement or any Promissory Note, or shall fail to pay when due any other amount owing to Secured Party under any other agreement between Secured Party and Debtor, or shall fail in the due performance or compliance with any other term or condition hereof or thereof, or shall be in default in the payment of any liabilities constituting indebtedness for money borrowed. . . .

*Id.* Lastly, these agreements all provide that "[t]he terms and provisions of this Agreement and of any other agreement between Debtor and Secured Party should be construed together as one agreement. . . ." *Id.* at ¶ 8.5.

b. *Retail Financing Agreements*

A retail financing agreement permits a lender to provide financing to individual retail customers of a dealership who have purchased vehicles from a dealership. This type of contract is embodied in this case by the Vehicle Financing Agreement,[6] pursuant to which CFC purchased from Pride numerous retail installment contracts entered into between Pride and its customers. The Vehicle Financing Agreements set forth a formula for determining the purchase price for each retail contract, which is determined by the amount financed, including the customer's purchase of extended warranties, credit life insurance or accident health insurance. Stips., ¶ 13. Should the customer pay off the retail contract before maturity, or should

---

**5.** All Exhibits cited herein have been fully admitted into evidence.

**6.** There is a separate Vehicle Financing Agreement between CFC and each of the Pride entities in this case. *See* Stips., ¶ 11.

the customer default on the retail contract, Pride is liable to CFC for the unrealized payment. Such liability is referred to as a "charge back."[7]

The Vehicle Financing Agreements also set forth Pride's obligation to pay a minimum reserve balance into accounts held by CFC in favor of CFC:

> The Reserve Account shall be maintained by you [CFC] in the following manner: 75% shall be maintained in a regular Reserve Account and 25% shall be maintained in a special Hold Reserve Account. The special Hold Reserve Account shall at all times be maintained at 1.5% of the then aggregate unpaid balance of all non-recourse[8] Contracts purchased from us [Pride] or $1000.00 whichever is greater.[9]

Exs. 1–5. While it is true that this so-called "holdback" provision existed in each of the Vehicle Financing Agreements, it is uncontested that CFC never enforced the 1.5% holdback against Pride, and instead enforced a holdback of $1,000, which was deposited in a special Hold Reserve Account,[10] for each of the Pride dealerships with which it had retail relationships.

### c. Retail and Wholesale Ventures

The first relevant business contact between the parties occurred on January 6, 1987, when Pride Chrysler–Plymouth entered into a Vehicle Financing and Repurchase Agreement with CFC.[11] Ex. 5. The relationship between CFC and Pride was steady for the next few years.

In late 1994, CFC began to explore the possibility of providing wholesale and retail financing to Pride's other dealerships. William Nicolo, a dealer relations manager for CFC stationed in Dedham, Massachusetts, approached Alfredo Dos Anjos ("Dos Anjos"), the principal of the Pride dealerships, in order to solicit Pride's wholesale and retail business. On January 26, 1995, after his attorneys had reviewed the documents (Dos Anjos did not read them) and after his assistant inquired about the possibility of altering the terms of the Security Agreement and Master Credit Agreement, Dos Anjos agreed to transfer his wholesale and retail business for the Blackstone Subaru dealership to CFC. One month later, he did the same for the Pride Dodge dealership. On August 29, 1996, in like manner, CFC obtained the wholesale business for Pride Chrysler–Plymouth and Pride Hyundai, both of which were being

---

7. The circumstances in which Pride would be liable for charge backs under the Vehicle Financing Agreements were often affected by Pride's decision to participate in CFC's "Guaranteed Dealer Reserve Plan" ("GDR"), a program initiated by CFC in 1990 that relieves a dealership from charge back liability for finance reserves where the retail customer has made at least three monthly payments to CFC. See Exs. 14–17; Stips., ¶ 14. It was only when a customer did not make three payments, therefore, that Pride could be charged back for interest, but this would not affect Pride's potential for charge backs for early termination of Vehicle Financing contracts that contained extended warranties, credit life insurance or accident health insurance.

8. The Vehicle Financing Agreements distinguish between "non-recourse" and "repurchase" contracts. The distinction is not relevant, however, because the parties stipulated at trial that none of the allegations relate to calculations under "repurchase" contracts.

9. The relevant language of the Vehicle Financing Agreement dated January 26, 1987 between CFC and Pride Chrysler–Plymouth differs substantially, see Ex. 4, but the parties agree that these differences are not material.

10. The parties agree that the special Hold Reserve Account has not been funded since at least 1995. Stips., ¶ 24.

11. This agreement was rapidly superseded by a Vehicle Financing Agreement dated January 26, 1987. Ex. 4.

financed by Bay Bank at the time.[12]

During the period of these wholesale financing business deals, the Zone Managers for CFC's Boston zone [13] were Michael Kellum (in 1995) and William Harrington (in 1996 and early 1997). Dos Anjos testified that he had several conversations with Harrington prior to the wholesale transfers, in which Harrington promised that in exchange for Pride's book of wholesale business, CFC would buy 100% of the retail contracts generated by Pride's customers. Nicolo testified, however, that (1) Kellum was not at all involved and Harrington was only peripherally involved in the contracts for the wholesale business; (2) Nicolo was the only CFC representative centrally involved; and (3) Nicolo had no discussions with Dos Anjos regarding how much of Pride's retail paper CFC would purchase as a condition precedent to CFC's acquisition of the wholesale business. Whatever the case, it is clear that while Harrington was in control, and after Pride transferred its wholesale financing business to CFC in 1995 and 1996, CFC bought a high percentage of Pride's retail paper, including more marginal or high risk retail paper (to wit, buying "deep") but never 100% of the retail paper. The retail purchasing relationship between CFC and Pride at that time was not, according to the uncontroverted testimony, in conformance with CFC's established buying practices.

### d. *1997: CFC Gets Ram–Tough*

All was quiet until October of 1997, when CFC, in response to grave losses it had sustained in its retail paper business during Harrington's tenure, replaced Harrington with Robert DiClemente. DiClemente testified that prior to assuming his duties in the Boston zone, he was told by his superiors that he should strive to "bring some stability" to the Boston zone because Harrington had acted irresponsibly and in disregard of CFC's purchasing guidelines and standards. Stips., ¶¶ 71–73.

DiClemente "tightened up" the retail credit relationship between the parties almost from the date of his arrival in the Boston zone, and began to purchase significantly less retail paper from Pride. This change dismayed and upset Dos Anjos because it greatly hampered Pride's ability to sell cars. Pride soon experienced significant losses and Dos Anjos was compelled to establish new retail financing relationships with other retail lenders.

### 2. *The Recapitalization Agreement and the Ford Focus*

Such were the losses sustained by Pride between late 1997 and early 1999 that the parties entered into a Recapitalization and Loss Replacement Agreement ("Recapitalization Agreement") on March 15, 1999, wherein Pride acknowledged its defaults under its sundry agreements with CFC, including sales out of trust [14] totaling approximately $900,000. *See* Ex. 41, ¶ 1.8. Under paragraphs 1.10 and 1.13 of the Recapitalization Agreement, CFC agreed to forbear from exercising its rights, including but not limited to termination of Plaintiffs' credit facilities and acceleration of Plaintiffs' indebtedness, in order to al-

---

**12.** As noted above, CFC already retained the retail business for Pride Chrysler–Plymouth, and obtained the retail business for Pride Hyundai on April 29, 1996.

**13.** CFC operates in various geographic "Zones," each of which is overseen by a "Zone Manager." The zone management structure also includes a dealer credit manager, a retail credit manager, a sales manager, and an administrative manager.

**14.** A sale out of trust occurs when a dealer does not pay the lender the wholesale floor plan amount financed after a vehicle is sold to a retail customer.

low the Pride entities to cure their defaults under the financing agreements. CFC also required that Dos Anjos collateralize Pride's indebtedness to CFC by signing and delivering a collateral security mortgage in the principal sum of $3,500,000 secured by property in Seekonk, Massachusetts. *See* Ex. 41, Tab A. CFC terminated the Recapitalization Agreement on or about July 7, 2000, after Plaintiffs invested $724,000 in the Pride dealerships to meet working capital requirements and Dos Anjos subordinated $429,000 of debt to meet effective net worth requirements. *See also* Ex. 28 (by April 27, 2000, CFC was already recommending that Pride's collateral mortgage be released); Ex. 34.[15]

In connection with the execution of the Recapitalization Agreement, Plaintiffs executed a General Release in favor of CFC which provided, in pertinent part, as follows:

> Releasors [Pride], do hereby, jointly and severally, release and discharge Chrysler Financial Corporation, the Releasee, and its successors and assigns and its officers, employees, agents, and attorneys from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, admiralty or equity, known

or unknown which against the Releasee, the Releasors, jointly or severally, or their successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any manner, cause or thing whatsoever from the beginning of the world to the day of the date of this Release.

Ex. 41, Tab D (hereafter, "the Release").

During this same period, Pride sought to replace CFC as its wholesale finance source for two of its other dealerships (both of which are not parties to this action): Pride Ford of North Attleboro, Inc. ("Pride Ford") and Pride Kia, Inc. ("Pride Kia"). Stips., ¶ 25. Ford Motor Credit Company ("FMCC") emerged as the most promising candidate to become Pride's new wholesale lender for these two dealerships, and on July 26, 1999, Pride wrote to CFC to inquire if there would be any difficulties with the release of the UCC filings for Pride Ford and Pride Kia should Pride wish to begin a wholesale relationship with FMCC. Stips., ¶ 26. FMCC then wrote to Pride on August 20, 1999, offering to extend new and used automobile floor plan financing to Pride Ford and Pride Kia.[16] Stips, ¶ 27.

The transfer of wholesale business from CFC to FMCC could not occur, however, unless CFC first were to release its security interest (manifested in CFC's UCC filings) in Pride Ford and Pride Kia. The reason for this, as explained by letter dat-

---

**15.** The parties dispute the financial condition of Pride (particularly with respect to the retail business) during and after the termination of the Recapitalization Agreement. Randall T. Jones, CFC's dealer credit manager for the Boston zone at the time, testified that Pride was still performing well below CFC's standards (in the "loss to liquidation" and repossession rates, for example), but there is also testimony (from this witness and others) that Pride's profitability increased substantially during this period. While resolution of this question is not essential to the outcome of the

case, the Court finds that Pride's financial condition had bottomed out and was improving at the time of the events which gave rise to the Complaint; however, Pride's financial history was sufficiently checkered so as to warrant concern.

**16.** FMCC was also interested in Pride Dodge, but DiClemente requested that Pride Dodge maintain its wholesale relationship with CFC, which request Pride acceded to in December of 1999. Stips., ¶¶ 28–29.

ed December 15, 1999 from counsel for Pride to counsel for CFC, is that the wholesale lender holds a first position security interest in the assets of the dealership, which is set forth in the UCC filings. *See* Stips., ¶ 32. CFC was willing to release its security interest (although there is testimony that CFC was interested in continuing the wholesale relationship in its entirety), provided that it received payment of $50,000 [17] from Pride. Stips., ¶ 30. CFC required the $50,000 payment in order to protect itself against the possibility that these two dealerships would incur future charge backs on their outstanding retail contracts. This is amply demonstrated by an internal CFC e-mail from Claude W. Miller, CFC's senior manager for dealer credit, to Randall T. Jones, the dealer credit manager for the Boston zone at the time, wherein Miller states:

> Additional requirements [for release of UCCs]:
>
> All retail deficit reserves to be paid in full.
>
> All interest ( [Wholesale], drac,[18] [capitalization loans], etc) to be paid.
>
> All [wholesale outstanding] to be paid in full or Chrysler recapitalized properly before UCC releases are released!!!!

Ex. 58.[19]

A flurry of heated correspondence between the parties regarding the charge back issue for Pride Ford and Pride Kia, as well as the release of collateral under the Recapitalization Agreement, occurred before these issues were negotiated to resolution. *See* Exs. 67, 68, 69, 72. Finally, on December 16, 1999, Pride delivered a check for $50,000 to CFC, *see* Ex. 65 (which CFC deposited into Pride Dodge's Cash Management Account),[20] CFC released its security interest in Pride Ford and Pride Kia, and FMCC assumed the role of wholesale and retail financier for the two dealerships thereafter. *See* Stips., ¶ 37.

### 3. *The Charge Back Odyssey and Pride's Quest for a New Wholesale Frontier*

December of 1999 also witnessed the culmination of a vigorous and important dispute between the parties as to the amount that Pride owed CFC in charge backs. Pride felt (and CFC apparently acknowledged) that it was not receiving the benefit of its status in the GDR program with respect to charge backs. Pride demanded credit for the overcharge or charge backs. CFC acknowledged the problem, but not the extent of it. Dos Anjos and DiClemente met on December 10, 1999 to discuss these differences, after which DiClemente testified that he made concerted efforts with his superiors (who were none too keen on the idea) to rectify CFC's over-calculation of Pride's deficits.

---

17. The derivation of the $50,000 figure seems to have been somewhat arbitrary, although DiClemente testified that, in retrospect, it constituted approximately 3% of the outstanding retail balance for the two dealerships.

18. The "DRAC" or "Dealer Rent–A–Car" program was one type of retail financing arrangement between CFC and Pride. *See* Ex. 89.

19. Counsel for Pride argued in closing that *the requirements expressed in Exhibit 58 were intended to apply only if all of Pride's* wholesale business was transferred, not simply the Pride Ford and Pride Kia dealerships. This is a strained reading that is not supported either by the document itself or by the context in which it was created.

20. The Cash Management Account ("CMA") is a non-interest bearing account controlled by CFC. Once CFC is paid for any charge backs on outstanding retail accounts (as applicable given the GDR program described *supra* at n. 7), the balance remaining in the CMA is returned to the dealer.

In June of 2000, Pride and CFC came to an agreement that CFC would credit Pride's Dealer Reserve Accounts in the amount of $251,680.31, along with an additional $25,000 credit for the Pride Hyundai store, in resolution of the charge back dispute. Stips., ¶ 64. The amount eventually credited to Pride did not necessarily represent the actual amount of incorrect charge back to Pride, but was instead heavily and heatedly negotiated by the parties.

By this point the relationship between the parties had become contentious enough that Pride was interested in switching all of its remaining wholesale financing to another lender. Pride first made inquiries with Manufacturers and Traders Trust Company ("M & T"), which in turn provided Pride with several wholesale floor plan financing[21] proposals between July 26, 2000 and July 6, 2001. Stips, ¶¶ 45–49; see Exs. 45–49. Like FMCC before it, M & T required a first position security interest in Pride's assets as a condition precedent. Stips., ¶ 50. On October 12, 2000, Pride paid M & T $10,000 as a show of Pride's "good faith" interest in proceeding with negotiations. Exs. 95–96. Matthew Ferrucci, Pride's comptroller and executive manager, and Dos Anjos were quite clear, however, that the $10,000 payment did not indicate that M & T had made a contractual wholesale commitment to Pride. Dos Anjos stated that the up-to-

the-last-minute process of ongoing dickering between prospective lender and borrower was integral to his business philosophy. The attempt to "get a better deal" continued until the deal was signed.[22]

These negotiations with M & T bore no fruit,[23] however, and they returned the $10,000 check to Pride.[24] The primary obstacle to a deal with M & T was that Pride and CFC could not agree on the terms under which CFC would release its wholesale UCC filings. In December of 2000, Pride had notified CFC that it was seeking alternate wholesale financing. This precipitated a telephone call from DiClemente to Ferrucci on December 18, 2000. In that telephone call DiClemente expressed several things: first, he was upset that Pride had chosen to replace CFC, after he had made efforts on behalf of Pride with respect to the charge back dispute that resulted in a credit to Pride of approximately $275,000; second, DiClemente stated that CFC was not going to "chase Pride" for any money it might owe; third, he stated that CFC would require a deposit from Pride of 3% of Pride's contingent retail liability in order for CFC to release the UCC filings; and finally, he stated that he would continue "tightening up" on Pride's "credit desk" (thereby purchasing less retail paper). See Ex. 39 (memorializing the substance of the telephone call). In turn, Ferrucci demanded to know which provision of the wholesale

---

21. M & T also offered Pride real estate financing. Stips., ¶ 46.

22. Dos Anjos' testimony illustrates this process:

Your Honor, when you get a proposal, we always tried to do better, to do a better deal, or get a better rate, or better terms or different languages. So when you get a commitment, it doesn't mean that everything stops. You continue talking to the lender or to any business and always get a different deal or better deal or different

understanding or corrections . . . by talking with them, say can we do better here, can we do better here, increase our lines. . . . [N]ormally that's what goes on.
Trial Transcript, March 25, 2003, p. 72.

23. Similarly stunted were any wholesale business negotiations between Pride and Sovereign Bank, FMCC, and World Omni.

24. Pride did elect, at M & T's request, to pay approximately $2,900 in attorneys' fees expended by M & T. See Exs. 82–83.

contracts between the parties would authorize such a 3% deposit from Pride. *Id.*

The answer to Ferrucci's question came (albeit indirectly) in a letter dated January 18, 2001, from Jonathan D. Deily, counsel for CFC. Deily informed Ferrucci that CFC would require Pride to deposit 1.5% (not 3%) of the total outstanding retail contracts (or $415,569) into the respective Dealer Reserve Account for each dealership, in order for CFC to release all of its wholesale UCC filings. Ex. 74. CFC's contractual authority for demanding the 1.5% deposit, Deily believed, existed in paragraph 3.1 of each of the Vehicle Financing Agreements.[25] *Id.* Deily explained that

> [t]he security interest of CFC evidenced by the existing UCC filing and the Security Agreement and Master Credit Agreement(s) stand as collateral for all obligations of the various dealerships to CFC, including obligations under the Vehicle Financing Agreements. Necessarily, resolution of this issue is required prior to the release of CFC's security interest.

*Id.*

Two letters followed this one, each evincing a steady deterioration in the relationship, but also a willingness to persevere in negotiating. Dos Anjos expressed that he had "serious problems" with DiClemente and his approach ("Based upon my workings with Mr. DeClemente [sic] over the past two years I have not been able to get anything accomplished without legal intervention, and this time seems to be no different."), and demanded to know the "chain of command" at CFC, so that he might by-pass DiClemente entirely. Ex. 75. DiClemente responded that CFC had already been overly accommodating in "forgiv[ing]" $200,000 of Pride's deficits, but hoped that the parties could work out their differences. Ex. H.

For the next few months, Pride demonstrated its growing displeasure with CFC (in particular, its displeasure with CFC's demand of the 1.5% security deposit against potential future retail charge backs) by intentionally defaulting on various requirements under its wholesale agreements. *See* Ex. 27. Specifically, Pride refused to provide monthly financial statements to CFC, refused to attempt to resolve Pride's working capital or net worth shortages, and refused to allow CFC access to its books and records at the individual dealerships. *Id.*; Ex. 76.

Any and all of these defaults would have sufficed to catalyze CFC's right, under paragraph 1.0 of any of the Security Agreement and Master Credit Agreements, immediately to cease providing wholesale financing to Pride. *See, e.g.*, Ex. 7, ¶ 1.0. But, for a time, CFC elected to forbear from exercising this privilege, in the hope that further negotiation would resolve the problems. On June 12, 2001, Dos Anjos, Ferrucci, and Rodney W. Bandy, CFC's Boston zone dealer credit manager in 2001, all met. At Dos Anjos' request, DiClemente did not attend this meeting. Although Dos Anjos was not willing to discuss Pride's defaults, he did offer to deposit $1,000,000 into CFC's CMA in exchange for the release of the UCC filings. However, Dos Anjos insisted

---

**25.** The only exception, as Deily noted, is the 1987 Vehicle Financing Agreement for Pride Chrysler–Plymouth, which instead contains a "walk-away" provision at paragraph 8. The walk-away provision was far more severe, as it would permit Pride to "walk away" from its liability to CFC only by depositing an amount equal to 5% of the aggregate unpaid balance on its retail contracts. *See* Ex. 5, ¶ 8. By 1990, the walk-away clause was no longer used by CFC in any of its contracts, and CFC did not attempt to enforce it in the case of Pride Chrysler–Plymouth.

that he be paid interest. Bandy rejected this offer because CFC is not authorized, as a bank would be, to pay its debtors interest. Ex. 77. Bandy, in turn, asked that Dos Anjos rectify his defaults and cooperate with CFC (in Bandy's words, that he "be a good dealer"), in exchange for which Bandy would attempt to find a mutually acceptable solution. *See id.* (the last paragraph of which contains such a "creative" solution). Dos Anjos refused, and Pride's defaults persisted.

On June 13, 2001, and in large measure as a result of Pride's defaults and the failure of negotiation, Bandy recommended that Pride be placed on "Finance Hold," essentially freezing Pride's wholesale lines of credit, thereby preventing Pride from receiving any new cars. *See* Ex. 26K.

### 4. The Avalanche of Correspondence: Final Endeavors to Salvage the Relationship and Negotiate a Resolution

On that very day, Jonathan Savage, counsel for Pride, wrote to counsel for CFC that Pride "object[ed] to being placed on credit hold," but offered to resolve the "stalemate with the expectation that CFC will follow suit." Ex. J. Savage indicated that Pride would provide CFC with end-of-month financial information, in cure of one of Pride's defaults. *Id.* However, Pride, through Savage, requested that CFC calculate the actual retail charge back exposure, because Pride felt that 1.5% was "unreasonably high." *Id.* Pride also offered CFC a letter of credit in lieu of cash to secure the charge back liability and obtain the release of the UCCs. *Id.*

Deily responded for CFC on June 15, 2001, expressing appreciation for Pride's agreement to cure some of its defaults, but noting that others still existed. *See* Ex.

80. Furthermore, he stated that CFC refused to perform any calculations of the retail charge back exposure, and the testimony has made plain that neither party has a firm notion of what this figure might be, or how to go about accurately determining it. *See id.* Lastly, he conveyed CFC's willingness to consider a letter of credit or another "format which would provide for a declining security based on the orderly liquidation of the retail portfolio and the reduction in CFC's potential exposure," in lieu of requiring Pride to post cash. *Id.* Pride rejected this offer, and instead filed suit against CFC in Rhode Island Superior Court on August 9, 2001.[26]

Subsequent to the filing of suit, however, the parties continued to negotiate in an effort to reach a settlement of the outstanding retail charge backs, as well as to resolve the issue of a new wholesale financing agreement between the parties. *See* Ex. LL (letters of September 26, 2002; October 17, 2002; October 18, 2002; October 21, 2002; and October 22, 2002).

Finally, on November 14, 2002, disturbed that Pride was unwilling to sign new wholesale agreements with CFC, Deily sent a letter to Preston W. Halperin, Savage's partner and co-counsel for Pride, setting forth the following "Letter of Intent" proposal:

> Although these revised wholesale financing documents were tendered several months ago, Pride has refused to execute same. DaimlerChrysler Services [CFC] previously advised that the wholesale credit facilities with respect to the Pride entities would be terminated unless the revised wholesale documents were fully executed on or before October 22, 2002.... DaimlerChrysler Services shall, with Pride's consent, "freeze" $250,000.00 of the current amount on

---

26. CFC removed the action to this Court on August 31, 2001.

deposit in the Pride [Chrysler–Plymouth] CMA, which funds will be held by DaimlerChrysler Services and controlled by DaimlerChrysler Services as collateral in order to satisfy any ultimate Pride liability to DaimlerChrysler Services under any wholesale financing agreement, including but not limited to the Dealer Reserve Account Agreement which is the subject of the pending action.... DaimlerChrysler shall be entitled to retain said $250,000.00 until such time as a court ... orders otherwise or until the parties mutually agree to an acceptable resolution of all outstanding issues. In consideration for the foregoing, DaimlerChrysler Services will refrain from placing the Pride entities on finance hold and will allow the Pride entities a period of time within which to replace its [sic] wholesale credit facilities.... In the event th[is] Letter of Intent is not fully executed and returned by [November 18, 2002], then DaimlerChrysler Services will place the Pride entities on "finance hold" and reserves the right to terminate the existing Pride wholesale credit facilities.

Ex. KK. Pride's attorneys negotiated the terms of this proposal to ensure that Pride preserved its rights in this litigation, and signed the proposal thereafter. No further negotiations ensued (none, at least, that are in evidence). At trial, counsel for

Pride moved, pursuant to Fed.R.Civ.P. 15(b),[27] to amend its pleadings to add the Letter of Intent in support of its Chapter 93A claim, which motion was granted.

It is not disputed that Plaintiffs' claim to legal damages is limited to the recovery of the $2,900 that Pride paid to M & T.[28] The primary relief Plaintiffs seek is their attorneys' fees, as authorized by the Massachusetts consumer protection statute. *See* Mass. Gen. Laws ch. 93A, § 11.[29] Furthermore, Plaintiffs and Defendant both seek a declaration of their rights under the terms of the Security Agreement and Master Credit Agreements and the Vehicle Financing Agreements, and Defendant requests its attorneys' fees and expenses as authorized thereunder.[30]

## II. Conclusions of Law

### 1. Preliminary Matters

#### a. Choice of Law

The parties have relied on both Massachusetts and Rhode Island law in their memoranda, arguing that the Rhode Island and Massachusetts requirements for claims of tortious interference with prospective contractual relations and breach of the implied covenant of good faith and fair dealing do not differ.

**27.** The rule provides, in relevant part:
 **(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings....
 Fed.R.Civ.P. 15(b).

**28.** As noted *supra* at n. 24, this sum was billed to M & T by its attorneys.

**29.** "If the court finds in any action commenced hereunder, that there has been a violation ... the petitioner shall, in addition to other relief provided for by this section and

irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."

**30.** Paragraph 6.0 of the Security and Master Credit Agreements provides:

 Debtor hereby agrees that it shall pay all expenses and reimburse Secured Party for any expenditures, including reasonable attorneys' fees and legal expenses, in connection with Secured Party's exercise of any of its rights and remedies under this Agreement.

Because this is a diversity action, the Court must apply the law of the forum state, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including that state's conflict of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir.1994) ("[i]n determining what state law pertains, the court must employ the choice-of-law framework of the forum state, here, Rhode Island"). However, where there is no conflict of law that would necessitate choosing between two states, the conflict of law analysis becomes unnecessary. *Pure Distrib., Inc. v. Baker*, 285 F.3d 150, 155 n. 3 (1st Cir.2002) (citing *Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir.1993)). The Court can discern no material conflict of law between Massachusetts and Rhode Island as respects claims of tortious interference with prospective contractual relations or breach of the implied covenant of good faith and fair dealing; choice of law analysis for these claims is thus unnecessary.

As for the Chapter 93A count, Massachusetts has a "real relationship" to the dispute, since some of the Pride entities are located there and the alleged harm underlying the violation occurred there. *See Scully Signal Co. v. Joyal*, 881 F.Supp. 727, 742–43 (D.R.I.1995).[31] Its law will therefore govern this claim.

b. *Effect of the Release*

At trial, the Court permitted both parties to proffer factual evidence ante-dating March 15, 1999, the date of the execution of the Release. The Court made clear that it allowed this evidence in order that it might gain a better understanding of the background circumstances underlying the parties' long and complicated relationship. In admitting the evidence, however, the Court also emphasized that it made no determination as to the validity or enforceability of the Release. *See Kristi's Restaurant Group, Inc. v. Zussman*, No. 963746, 2000 WL 282513, *1 n. 6 (Mass.Super. Feb. 14, 2000) (evidence admitted *de bene esse* in a Chapter 93A action was later excluded by operation of a general release).

■ The Court now rules that the Release is valid and enforceable. *See Leblanc v. Friedman*, 438 Mass. 592, 597–98, 781 N.E.2d 1283 (2003); *Schuster v. Baskin*, 354 Mass. 137, 140, 236 N.E.2d 205 (1968) (absent evidence of fraud, general releases are "to be given effect, even if the parties did not have in mind all the wrongs which existed at the time of the release") (citation omitted). The Release contains broad language insulating CFC from liability for any claims Pride may have had against CFC prior to March 15, 1999. Moreover, the mere fact that Plaintiffs bring a Chapter 93A claim does not vitiate the efficacy of the Release.

Therefore, the Court will not consider any evidence pre-dating March 15, 1999 in support of any of the claims Plaintiffs have asserted.[32]

2. *The Dragnet Clause*

a. *Determining the Parties' Intent*

■ The Dragnet Clause is the engine that drives this case; the enforceability *vel*

---

**31.** Defendant has conceded (by its silence) that Plaintiffs have shown that the "transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]." Mass. Gen. Laws ch. 93A, § 11.

**32.** Notwithstanding this ruling, however, the Court notes parenthetically that its conclusions with respect to the Chapter 93A claim (as discussed *infra* at 3(b)) would not change even if it were to consider any evidence prior to March 15, 1999.

*non* of the Dragnet Clause with respect to Pride's obligation in paragraph 3.1 of the Vehicle Financing Agreements ultimately will rule the fate of all claims.

The UCC, as adopted both in Massachusetts and Rhode Island, explicitly authorizes the use of dragnet clauses. *See* Mass. Gen. Laws ch. 106, § 9–204; R.I. Gen. Laws § 6A–9–204.[33] Nevertheless, courts have frequently restrained the enforcement of dragnet clauses. Plaintiffs direct the Court to Professor Campbell's discussion of the scope and application of dragnet clauses (sometimes called "all obligations" or "future advance" clauses). *See* Bruce A. Campbell, *Contracts Jurisprudence and Article Nine of the Uniform Commercial Code: The Allowable Scope of Future Advance and All Obligations Clauses in Commercial Security Agreements,* 37 Hastings L.J. 1007 (1986).

> Although the Code allows the parties to secure all the debtor's obligations, questions often arise in particular cases as to whether the parties originally intended to go as far as the Code permits, and, if so, what restrictions might limit claims which have been enlarged through the creditor's overreaching or abusive behavior....

> If an original security agreement contains a clause securing all obligations of the debtor to the creditor, and over time the debtor becomes obligated to the creditor in a number of transactions and

in a variety of ways, by what standards do we decide which of these obligations was "intended" by the parties to be secured?

*Id.* at 1025–26.

Courts examining this problem have likewise concluded that the intent of the parties, in view of the particular circumstances and language employed, is the "guiding principle in construction of a dragnet clause." *In re Ballarino,* 180 B.R. 343, 346 (D.Mass.1995) (citing *In re Goodman Indus.,* 21 B.R. 512, 516–17 (Bankr.D.Mass.1982)); *Debral Realty, Inc. v. Marlborough Cooperative Bank,* 48 Mass.App.Ct. 92, 94, 717 N.E.2d 1023 (1999); *see Massachusetts Municipal Wholesale Electric Co. v. Town of Danvers,* 411 Mass. 39, 45–46, 577 N.E.2d 283 (1991) ("To ascertain intent, a court considers the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances.").

In part because of their potential for abuse by the lender, "dragnet clause[s] will not be considered to include future advances [1] 'unless the facts reveal that said advances are of the same kind and quality or relate to the original transaction, or [2] unless the new obligation incurred refers [to the original transaction] or was contemplated by the parties....'" *Ballarino,* 180 B.R. at 346 (citing *Goodman Indus.,* 21 B.R. at 516–17).[34] Massachusetts state and federal courts have also

---

**33.** The two statutes are identical and provide, in relevant part:

> After–Acquired Property; Future Advances (a) After-acquired collateral.... [A] security agreement may create or provide for a security interest in after-acquired collateral.
> ....
> (c) Future advances and other value. A security agreement may provide that collateral secures, or that accounts, chattel paper, payment intangibles, or promissory notes are sold in connection with, future

advances or other value, whether or not the advances or value are given pursuant to commitment.

Mass. Gen. Laws ch. 106, § 9–204; R.I. Gen. Laws § 6A–9–204.

**34.** *Regency Elec., Inc. v. Lavine Distrib., Inc.,* No. M.P. 013766, 1987 WL 859800 (R.I.Super. Mar. 6, 1987) is the only Rhode Island decision addressing the validity of a dragnet clause, and sets forth an identical analytical test to determine the parties' intent.

relied on the following test to divine the parties' intent:

> A principle which has been applied by a number of courts in other jurisdictions to aid in determining intent is that a dragnet clause will generally be construed to apply to *"only debts of the general kind* of those specifically secured," or which bear a "sufficiently close relationship to the original indebtedness," that the [intent] of the debtor can be inferred.

*Id.* at 346–47 (citing *Financial Acceptance Corp. v. Garvey,* 6 Mass.App.Ct. 610, 613, 380 N.E.2d 1332, 1335 (1978)) (emphasis in original) (all other internal citations omitted).

"While so called 'dragnet' clauses are narrowly construed where they are used oppressively or as a device for fraud, 'relief from the effect of dragnet clauses involves principles of equity.'" *Id.* at 347 (citing *Everett Credit Union v. Allied Ambulance Serv., Inc.,* 12 Mass.App.Ct. 343, 346, 424 N.E.2d 1142, 1145 (1981) (citations omitted)). Moreover, and of some importance in this case, "[t]he fact that a later loan does not make reference to an earlier [obligation] and has its own collateral does not constitute a waiver of the dragnet provision." *Id.*

The relevant language of the Dragnet Clause secures

each and every . . . indebtedness or obligation now or hereafter owing by Debtor to Secured Party including any collection or enforcement costs and expenses or monies advanced on behalf of Debtor in connection with any such other indebtedness or obligations.

Exs. 6–9. This language, taken *per se,* undoubtedly secures Pride's obligations under its retail agreements with CFC.

Plaintiffs argue that the parties never intended the Dragnet Clause in the Security Agreement and Master Credit Agreements to secure Pride's contingent liabilities under the Vehicle Financing Agreements. However, as set forth above, Pride's consent to be bound may be inferred if either (1) the wholesale agreements and retail agreements are of the same general kind or quality, or (2) the wholesale agreements bear "a sufficiently close relationship to" the retail agreements.

It is true that Dos Anjos testified that he did not intend the Dragnet Clause to secure his potential retail charge back liability. This testimony, however, is of little weight because Dos Anjos also testified that he never read any of the wholesale contracts: it is not clear, therefore, what intent, if any, he had formed at the time of their execution.[35] Moreover, there was testimony that Pride's attorneys were given the opportunity to review the wholesale contracts;[36] indeed,

---

35. As defense counsel aptly stated: "If the plaintiff elected not to understand what the plaintiff was signing, then [he] cannot be heard to complain later that what [he] signed wasn't what [he] perceived it to be in [his] chosen ignorance." Trial Transcript, April 2, 2003, p. 30.

36. In fact, a cursory review of the wholesale agreements reveals not only the breadth of the Dragnet Clause, but also additional evidence of full collateralization at paragraph 6.0, which establishes CFC's right to terminate the wholesale agreements if Pride "shall fail to pay when due any other amount owing to Secured Party under any other agreement between Secured Party and Debtor, or shall fail in the due performance or compliance with any other term or condition hereof or thereof." Exs. 6–9, ¶ 6.0 (emphasis supplied). So, too, paragraph 8.5, which expressly notifies Pride that "[t]he terms and provisions of this Agreement and of any other agreement between Debtor and Secured Party should be construed together as one agreement. . . ." *Id.*

Dos Anjos' assistant attempted to negotiate some of the terms, but was told unequivocally by CFC that the terms of the Security Agreement and Master Credit Agreements could not be dickered. The parties are both experienced business entities, and are both represented by highly competent counsel capable of reading, understanding, and negotiating complex contracts. Therefore, this writer can find little reason to infer a lack of intent from the circumstances surrounding Pride's agreement to the contracts containing the Dragnet Clauses. The most that can be inferred is a deliberate ignorance of the terms of this deal.

There is also Exhibit 58, which on its face establishes that, in 1999 at the least, CFC intended the wholesale agreements to secure Pride's retail debts: "Additional requirements [for release of UCCs].... All retail deficit reserves to be paid in full ... before UCC releases are released!!!!" Pride got this message and provided the security demanded before the UCCs were released. It did not object in 1999 that this was not the intended effect of the Dragnet Clause.

Furthermore, most of the Security Agreement and Master Credit Agreements for each Pride entity were signed contemporaneously with (or within a few months of) the corresponding Vehicle Financing Agreements, and the testimony is undisputed that there was no independent security for the Vehicle Financing Agreements. This suggests two crucial inferences: first, that the wholesale and retail agreements are, in fact, generally similar in kind, as they are automobile financing contracts that were contemplated at the same time and represented working parts of the same

business relationship; and second, that CFC intended to rectify the absence of security in the Vehicle Financing Agreements by imposing such security *via* the Dragnet Clause in the Security Agreement and Master Credit Agreements.[37] Plaintiffs suggest that if CFC had intended to secure future retail charge backs, it should have specifically so stated in the wholesale agreements. Perhaps so, but the law does not require such detail—the wholesale agreement need not "reference" the retail obligation in order to secure it. *See Ballarino*, 180 B.R. at 347. The law demands only that a dragnet clause secure an obligation of like kind. This Dragnet Clause easily meets that test.

b. *Waiver*

■ Plaintiffs next posit that even if the Court were to read the Dragnet Clause as securing Pride's contingent retail charge back liability, CFC waived its right, by failing to exercise it, to establish and maintain a special Hold Reserve Account under the Vehicle Financing Agreements, wherein it could enforce paragraph 3.1's 1.5% clause. Indeed, the testimony is uncontroverted that CFC never enforced the 1.5% holdback against Pride until the end of 2000, after Pride advised CFC of its intention to replace CFC as its wholesale lender. Therefore, the argument proceeds, CFC cannot now use the Dragnet Clause to enforce a waived right.

This argument is rebutted in two ways. First, the Security Agreement and Master Credit Agreements all contain a clearly demarcated no-waiver clause:

> No failure or delay on the part of Secured Party in exercising any power or right hereunder shall operate as a waiv-

---

37. The exception to this arrangement, as noted by Pride's counsel in his closing argument, is the 1987 Pride Chrysler–Plymouth Vehicle Financing Agreement. As stated earlier, however, this agreement, unlike all of the others, imposed the harsh walk-away provision, which is itself some security against Pride's potential future retail charge backs.

er thereof, nor shall any single or partial exercise of any such right or power preclude any other or further exercise thereof or the exercise of any other right or power hereunder.

Exs. 6–9, ¶ 8.6. By this agreement of the parties, CFC did not waive its rights under the Dragnet Clause by inaction.

Second, the evidence is also clear that the charge back and reserve deficit issues were important to CFC throughout the relationship, and were certainly (in its view) never abandoned or waived. Indeed, CFC insisted in 1999 that Pride deposit $50,000 into Pride Dodge's CMA, expressly for the purpose of securing Pride Ford's and Pride Kia's contingent retail liabilities, prior to the release of the UCCs securing such liabilities. There was testimony both that this figure was arbitrarily selected and that it represented 3% of the outstanding retail contracts for those dealerships. Whatever the case, there is no dispute that by demanding the $50,000, CFC was exercising its right (by operation of the Dragnet Clause) to require Pride to post a sum of money securing its potential retail liability before releasing its wholesale security interest in Pride Ford and Pride Kia, essentially exchanging one form of security for another.

 Both Rhode Island and Massachusetts recognize that waiver is the voluntary and intentional relinquishment of a known right, and can result from action or inaction. *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.*, 488 A.2d 723, 725 (R.I. 1985) (citing *Pacheco v. Nationwide Mut. Ins. Co.*, 114 R.I. 575, 577, 337 A.2d 240 (1975)); *Dunkin' Donuts Inc. v. Panagakos*, 5 F.Supp.2d 57, 60 (D.Mass.1998) (citing *Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 992 (1st Cir.1988) (all other citations omitted) (finding of waiver premised on "clear, decisive, and *unequivocal*

conduct" that a party will not insist on adherence to contract) (emphasis in original)).

Here, there is no evidence that CFC ever intentionally or unequivocally relinquished its right, pursuant to the Dragnet Clause, to secure Pride's contingent retail liability. Moreover, the source of the right enforced by CFC, which led to this litigation, does not ultimately spring from paragraph 3.1 of the Vehicle Financing Agreements, authorizing a $1,000 or 1.5% holdback. Instead, it is CFC's right under the Security Agreement and Master Credit Agreements to keep its UCC filings in place until and unless Pride posts some satisfactory alternate security to replace those UCC filings. CFC's demand of 1.5%, like its earlier demand of $50,000 for Pride Ford and Pride Kia, served merely as a reference point for a reasonable figure for this alternative security. Pride's waiver argument therefore fails.

### 3. *Pride's Causes of Action*

Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, violation of Mass. Gen. Laws ch. 93A, and tortious interference with prospective contractual relations all grow from the same factual loam.

Plaintiffs' basic complaint is that CFC prevented Pride from moving its wholesale financing to another lender, such as M & T (the only lender to whom Pride had actually paid any money in the hope of establishing contractual relations), by refusing to release its wholesale UCC filings. The tortious pillar of Plaintiffs' case rests primarily on the conduct of DiClemente in December of 2000 and the events that followed. Upon being informed that Pride wished to replace CFC as its wholesale lender, a peeved DiClemente made imprudent, even ill-advised, statements to Ferrucci. He stated: (1) that CFC was not

going to "chase Pride" for any money it might owe; (2) that CFC would require a deposit from Pride of 3% of Pride's contingent retail liability in order for CFC to release the UCC filings; and (3) that he would purchase less of Pride's retail paper. The testimony established that DiClemente was upset, in large part because he felt that he had championed Pride's position respecting the deficit dealer reserve charge backs with his superiors, and had succeeded in convincing CFC to write off approximately $275,000 of Pride's debt. Of course, Pride believes that these charges should never have been assessed because of its participation in the GDR program. However, neither party could calculate with any precision the amount of charge backs CFC improperly assessed against Pride. The resolution of the charge back issue, and the decision to apply a "credit" of about $275,000, appears to have come about, like so much else in this case, through the parties' sustained course of hard-nosed negotiations.[38]

It is also uncontested that, despite DiClemente's impetuous remark, CFC never sought to compel Pride to post 3% of its contingent retail liabilities. Deily's letter of January 14, 2001 demanded only 1.5%, or, at that time, $415,569. Plaintiffs claim that this, too, was overly onerous, but CFC did have the right, as found *supra* at 2(a), to use the Dragnet Clause to require *some* alternative security for Pride's potential retail liabilities. Neither party was able to provide this Court with evidence of the actual amount. This Court cannot conclude that it is unreasonable without any evidence; and, indeed, given that it is a figure bargained by the parties, contained in their agreement, and less than the amount paid two years earlier to secure the Ford and Kia retail charge back liability, this Court must conclude that it is a presumptively reasonable figure.

The January 15, 2001 demand was merely the beginning of another long process of bargaining and negotiation—entirely in keeping with the manner in which the parties had always conducted their business: Pride announced its dissatisfaction with CFC's 1.5% demand; CFC stated that it had already been exceedingly generous with Pride by "writing off" its debts; Pride began intentionally defaulting on its contractual obligations in an attempt to leverage some advantage; CFC in turn threatened to place Pride on Finance Hold if it did not live up to its wholesale obligations; Pride refused to discuss its defaults, but offered to place $1,000,000 into a CMA, provided that it receive interest; CFC refused because it was not licensed to pay interest to its debtors; CFC, through Bandy, told Pride to cure its defaults in exchange for which CFC would make some type of contractual exception for Pride; Pride refused and was placed on Finance Hold; Pride offered to cure some, but not all, of its defaults; CFC held firm on its 1.5% demand; Pride offered a letter of credit in lieu of posting cash, but demanded that CFC calculate the actual amount of its potential retail charge backs; and, finally, CFC refused to perform any calculations, but agreed to consider a letter of credit or some other alternative to the posting of cash.

It was at this point that Pride walked away from the bargaining table and sued CFC. Thereafter, for several months and after several warnings from CFC, Pride refused to sign CFC's new wholesale agreements, at which point CFC made the proposal contained in its Letter of Intent:

---

**38.** Although he was not working in the Boston zone at the time of these negotiations, Bandy testified that he believed CFC's charge back error was less than the amount "credited" to Pride.

if Pride placed $250,000 in the Pride Chrysler–Plymouth CMA as collateral for potential retail charge backs, CFC would not place Pride on Finance Hold and would release the UCC filings so that Pride could seek alternate wholesale financing. If Pride refused, CFC would place the entities on Finance Hold and threatened to terminate the wholesale facilities. Pride refused.

### a. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

The question, of course, is whether the conduct of CFC, the stronger of the two combatants, crossed the line from hard bargaining to oppressive, bad faith, or opportunistic behavior. Rhode Island and Massachusetts recognize that there is a covenant of good faith and fair dealing implied in every contract so that contractual objectives may be achieved. Under Rhode Island law, the standard for determining whether a party has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct. *See Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd.*, 748 F.Supp. 936, 942 (D.R.I.1990) (citing *Psaty & Fuhrman, Inc. v. Housing Authority*, 76 R.I. 87, 93, 68 A.2d 32, 36 (1949)). In Massachusetts, a plaintiff must show that there existed an enforceable contract between the two parties and that the defendant did something that had " 'the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract.' " *Laser Labs, Inc. v. ETL Testing Laboratories, Inc.*, 29

F.Supp.2d 21, 24 (D.Mass.1998) (citing *Anthony's Pier Four v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 820 (1991) (all other citations omitted)).

Though the standards vary slightly,[39] Plaintiffs have not proven that CFC's refusal to release the UCC filings was in bad faith, or that it destroyed Pride's right to receive the benefit of its bargain with CFC. As discussed above, CFC was entitled to obtain alternative retail security from Pride before releasing its wholesale UCCs. Indeed, for a time, Pride enjoyed a boon for which it had not bargained—it was not required, since approximately 1995, to fund the special Hold Reserve Account, despite its contractual obligation to do so. However, CFC's failure to enforce one of its rights to security does not waive its alternative right under the Dragnet Clause of the Security Agreement and Master Credit Agreements, nor does it imply that CFC has waived its right to demand the posting of alternative security to collateralize Pride's outstanding retail obligations as a condition of releasing the UCCs. In other words, CFC's enforcement of its right does not destroy Pride's right to receive the fruits of what it had bargained for in the Security Agreement and Master Credit Agreements. Of course, had the facts been slightly different, *i.e.* had CFC, in response to Pride's decision to change wholesale lenders, attempted to enforce the holdback and still refused to release the UCCs—effecting double security—the result would be different. That is not what CFC did. In-

---

**39.** In Rhode Island, "a breach of the duty of good faith and fair dealing gives rise only to a breach of contract claim, not to a tortious cause of action." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F.Supp.2d 317, 329 (D.R.I.1999). Because the Court has already determined that CFC's enforcement of the Dragnet Clause was not a breach of the Security Agreement and Master Credit Agreements, this alone would suffice to extinguish Pride's breach of the implied covenant of good faith and fair dealing claim under Rhode Island law.

stead it enforced its right, drove a hard bargain and played tough, but not unfair.

### b. *Chapter 93A*

 The seminal case in the law of Chapter 93A is *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806 (1991).

> General Laws c. 93A, § 2(a) ... makes unlawful any "[u]nfair ... acts or practices in the conduct of any trade or commerce." This prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by G.L. c. 93A, § 11.... We have said that conduct "in disregard of known contractual arrangements" and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes....
>
> Under G.L. c. 93A, § 11, [a party] is entitled to multiple (not more than treble and not less than double) damages if [the violator] acted "knowingly" or "wilfully" in violation of § 2. "A judge need not make an *express* finding that a person wilfully or knowingly violated G.L. c. 93A, § 2, as long as the evidence warrants a finding of either."

*Id.* at 474–75, 583 N.E.2d 806 (emphasis in original) (internal citations omitted). The Court focuses "on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." *Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.*, 420 Mass. 39, 42–43, 648 N.E.2d 435 (1995) (citing *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366

Mass. 593, 596, 321 N.E.2d 915 (1975)). A breach of contract alone does not amount to a Chapter 93A violation, unless it rises to the level of "commercial extortion" or a similar degree of culpable conduct. *Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 217 F.3d 33, 40 (1st Cir. 2000).[40] "However, a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." *Duclersaint v. Fed. Nat'l Mortgage Ass'n*, 427 Mass. 809, 814, 696 N.E.2d 536 (1998).

The circumstances of the *Propac–Mass* case illustrate the type of conduct that meets the Chapter 93A standard. There, the plaintiff, an unincorporated reciprocal insurance company, properly terminated its agreement with the defendant, its attorney-in-fact. 420 Mass. at 40, 648 N.E.2d 435. Following the termination, the defendant breached its contractual obligation to cooperate with the plaintiff to find a new attorney-in-fact, and instead actively sought to interfere with and harm the plaintiff's business by

> remov[ing] files to another location without notice to the [plaintiff]; inform[ing] [the plaintiff] ... that it was vacating the [plaintiff's] principal office; t[elling] subscribers that their workers' compensation insurance would be jeopardized if they signed a new power of attorney appointing a different attorney-in-fact; instruct[ing] subscribers to pay premiums to it instead of to the [plaintiff]; and conduct[ing] a campaign to solicit subscribers for its own account.

*Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979); *see also Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 226, 598 N.E.2d 666 (1992) (93A violation has "an extortionate quality that gives it the rancid flavor of unfairness").

---

**40.** The characterization of the 93A violation, somewhat disprized in recent days (*see, e.g., Propac–Mass*, 420 Mass. at 42, 648 N.E.2d 435), still bears mention: 93A violations attain a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Levings v.*

*Id.* at 42, 648 N.E.2d 435. In finding this conduct to rise to the level of a Chapter 93A violation, the Supreme Judicial Court stated:

> conduct undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect and jeopardizing the interests of subscribers in preserving their workers' compensation coverage has a coercive quality that, with the other facts, warrant[s] a finding of unfair acts or practices.
>
> Moreover, unilateral, self-serving conduct ... during the course of a dispute as to [defendant's] right to continue as attorney-in-fact was not fair dealing in good faith.... [B]y its conduct, [defendant] created unnecessary uncertainty among the [plaintiff's] subscribers concerning their workers' compensation coverage.

*Id.* at 43, 648 N.E.2d 435.

██ The Court describes no such objectionable conduct in this case. First, and as already stated, CFC is fully within its rights to enforce the Dragnet Clause until such time as Pride posts alternative security collateralizing the contingent retail charge backs. CFC, therefore, did not breach its contract with Pride—it enforced it. Second, and perhaps more crucially, CFC never behaved in an overtly objectionable or unfair manner. Rather, the evidence demonstrates that CFC and Pride are both seasoned business enterprises, with an approach toward business heavily dependent on hard-nosed bargaining and shrewd negotiation. Their relationship certainly had its more tenacious and contentious moments, but there is no evidence of deceptive or extortionate behavior. CFC never hid its intentions from Pride: it demanded security for the retail charge back exposure, either in the form of the wholesale UCCs or in an alternate form. Indeed, the most wilfully objectionable acts, which were doubtlessly "in disregard of known contractual arrangements," were performed by Pride when it intentionally, even flagrantly, defaulted on its undisputed obligations to CFC in 2001 in order to gain leverage in the wholesale dispute. It is telling of their relationship that, even in the face of such blatant disregard for contractual obligations, CFC *and* *Pride* continued to negotiate toward a resolution for some time thereafter.

Moreover, the November 14, 2002, Letter of Intent, CFC's latest play in this rugby scrum, was not grossly unfair to Pride. The Letter of Intent simply acknowledged that Pride had refused to sign CFC's new wholesale contracts (again, as a negotiating stratagem on Pride's part), and presented Pride with various alternatives to resolve the conflicts between the parties. Pride negotiated the language of the Letter of Intent to preserve its rights in this litigation, and then chose to sign. Nothing in this transaction implies that CFC's conduct was transformed from tenacious business practice into unscrupulous, oppressive, or deceitful conduct.

The statute that Pride seeks to use to turn the table on CFC, Chapter 93A, was not meant, and should not be used, to alter the fundamental and natural terrain of the field of economic competition on which these players play. Resistance to governmental interference with market dynamics is rooted in the early works of political economics and philosophy. In his magnum opus, *On Liberty*, John Stuart Mill stated that "society admits no right, either legal or moral, in the disappointed competitors ... and feels called on to interfere, only when means of success have been employed which it is contrary to the general interest to permit—namely, fraud or

treachery, and force."[41] The diffidence with which we must view government in-terference in the natural workings of a free economy is a fundamental value, and has always formed a central part of this country's political and economic traditions.

The twentieth century witnessed the proliferation of consumer protection statutes such as the Federal Trade Commission Act of 1914 and, later, Massachusetts' Chapter 93A, enacted in 1967.[42] Section 11 of that statute, which enables businesses to sue other businesses for "unfair or deceptive behavior" in the marketplace, was added by amendment in 1970. "Chapter 93A departed from the traditional concern that liability for commercial injury be based upon a showing of both a bad act and a wrongful state of mind."[43] It is no doubt true that the increased interventionism contemplated by Chapter 93A and its strip stemmed, at least in part, from a desire to remedy what had been gross inequalities in bargaining power that had resulted in deceitful or unfair practices by powerful market players against weak ones.

Nevertheless, Chapter 93A, which, like its many counterparts, was rooted in the common law contractual doctrine of unconscionability, was never intended to serve as the great avatar of equalization, leveling all of the market economy's inherent inequalities of bargaining power. The victim of "immoral, unethical, oppressive, or unscrupulous" business practices now has recourse to statutory remedies such as Chapter 93A not historically available at common law, see *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 27, 679 N.E.2d 191 (1997) (citing *PMP Assocs.*, 366 Mass. at 596, 321 N.E.2d 915), but the principle of uninhibited commerce between parties (especially businesses)[44] of unequal

---

**41.** John Stuart Mill, *On Liberty* 98 (The Modern Library Classics ed.2002) (1859). Naturally, Mill was not the first to conceive of this principle of "classical" liberalism. *See* Richard A. Posner, *Overcoming Law* 23 n. 33 (Harvard University Press 1995) (tracing the "germ" of this concept to the funeral oration of Pericles, as reported in Book II of Thucydides' *The Peloponnesian War*).

**42.** The Automobile Dealers' Day in Court Act of 1956 (15 U.S.C. §§ 1221–1225) and its Massachusetts analogue (Mass. Gen. Laws ch. 93B) are two close-to-home exemplars of the policy of increased legislative interventionism. Like all such statutes, they attempt to level the playing field or regulate market forces which, if left to their own devices, would lead to consumer harm. Those statutes, however, are concerned primarily with overseeing the franchise relationship between automobile manufacturers and their dealerships. *See* 15 U.S.C. § 1222; Mass. Gen. Laws ch. 93B, § 11. In the context of automobile allocation, where the manufacturer possesses all of the goods *ab initio*, principles of antitrust support a more proactive regulatory policy. The automobile financing context is quite different, since there are many more market

players and therefore less inherent likelihood of inequitable or coercive conduct.

Furthermore, the fact that some legislatures have seen fit to intervene more aggressively in certain specialized contexts does not diminish the argument, even in this statutory genre, that the guiding "principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." U.C.C. § 2–302, cmt. 1 (citation omitted).

**43.** Michael C. Gilleran, § 1.1 *The Law of Chapter 93A: The Massachusetts Consumer and Business Protection Act* 4 (1989).

**44.** Indeed, one commentator has observed that "courts have generally been chary about using the doctrine of unconscionability to protect merchants and similar professionals, declining to apply the doctrine in favor of sophisticated corporations." E. Allan Farnsworth, *Farnsworth on Contracts* § 4.28, at 564 (2nd ed.1998) (citing *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 333 (7th Cir.1987) (noting that although "the relative sizes, and perhaps bargaining powers, of Ford and any of its dealers are unequal, they are not grossly unequal," and that

bargaining power, and the full panoply of economic forces and pressures that go with it, remains vital in the modern American business environment.

In this case, the pattern of hard-nosed bargaining which characterized the relationship between Pride and CFC from its inception is reflective of what Dos Anjos described in his testimony (with no small degree of justifiable pride, given what he has built from nothing)—negotiate until the bitter end. Unfortunately for Dos Anjos, he was in no position to force his will on CFC. His claim that CFC violated Chapter 93A (or, for that matter, that CFC breached the implied covenant of good faith and fair dealing or tortiously interfered with Pride's contractual relations) simply rings hollow when viewed through the prism of the parties' historical relationship of rough and tumble business dealings.

Pride, as a car dealership, no doubt must understand these points. Car dealers use their market power and knowledge against retail car buyers every day. In these dealings, of course, the dealer is the powerful market player and the buyer the weak one. The entire car buying experience is filled with tactics in which dealers use their market power to obtain a more profitable deal from their customers. These tactics may be offensive to many, but they are generally not illegal. Likewise, when the dealership is on the receiving end of bargaining that is no less unpleasant, it is only a victim of its own market position, not of any illegal act by its financier. It is precisely this type of aggressive, but not unethical, commercial exchange between businesses with varying degrees of economic power which embodies and continues to strengthen the salutary traditions of liberalism in the American marketplace.

### c. *Tortious Interference with Prospective Contractual Relations*

 Tortious interference with prospective contractual relations consists of the following five elements: (1) the existence of a business relationship or expectancy with a third party; (2) the defendant's knowledge of that relationship or expectancy; (3) an intentional act of interference by the defendant; (4) the causing of harm to the plaintiff by virtue of the interference; and (5) resulting damages. *See New England Multi–Unit Housing Laundry Ass'n v. Rhode Island Housing and Mortgage Fin. Corp.*, 893 F.Supp. 1180, 1193 (D.R.I.1995) (citing *Mesolella v. City of Providence*, 508 A.2d 661, 669 (R.I. 1986)); *Adcom Products, Inc. v. Konica Business Machines USA, Inc.*, 41 Mass. App.Ct. 101, 104, 668 N.E.2d 866 (1996) (element of damages not identified separately) (citing *United Truck Leasing Corp. v. Geltman*, 26 Mass.App.Ct. 847, 855, 533 N.E.2d 647 (1989)).

 Plaintiffs' claim falters on several fronts. First, Plaintiffs have not established that they had a business relationship or expectancy with any other wholesale lender. Although Pride received a "commitment" from M & T, the testimony is clear that this relationship never proceeded beyond the negotiation phase. The testimony also failed to establish the second element—namely, that CFC was ever

---

the dealer was "no neophyte in the automobile dealership business") (all other citations omitted)); *see also* Robert S. Adler, Elliot M. Silverstein, *When David Meets Goliath: Dealing with Power Differentials in Negotiations*, 5 Harv. Negot. L.Rev. 1, 48 (2000) (courts are

"unreceptive to unconscionability claims by . . . merchants against other merchants. No doubt this reflects the general view that persons of greater sophistication suffer less contractual abuse and need less protection.").

aware of the negotiations between Pride and M & T.

Most grievous to this claim, however, is the fact that Plaintiffs have not shown that CFC acted with "legal malice," *i.e.,* "the intent to do harm without justification." *New England Multi–Unit Housing Laundry Ass'n,* 893 F.Supp. at 1193 (citing *Mesolella,* 508 A.2d at 670); *cf. United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 816, 551 N.E.2d 20 (1990) (replacing the word "malicious" with "improper," but nevertheless requiring "wrongful conduct" to support claim of tortious interference with prospective contractual relations). In fact, CFC was legally entitled to require Pride to post collateral; that CFC did not release its UCC filings when Pride failed to post such collateral hardly constitutes "wrongful" or "improper" conduct. Pride's claim for tortious interference with prospective contractual relations is therefore meritless.

### 4. *Claims for Declaratory Relief*

▉ Pride and CFC both ask the Court for a declaration of their rights, pursuant to 28 U.S.C. § 2201.[45] Specifically, the parties seek a declaration from the Court as to whether or not Plaintiffs are required to set aside a reserve amount minimum balance equal to 1.5% of the unpaid balance on all retail contracts purchased by CFC to secure future retail liabilities to CFC. While the Court expresses no opinion on whether or not the 1.5% figure accurately reflects Pride's actual retail charge back exposure, it does find that 1.5% is not an unreasonably high figure.[46] The Court finds for CFC and against Pride on this issue. CFC has the right to require payment of the 1.5% holdback, even though it has failed to exercise this right over a significant period of time.

### 5. *The Parties' Request for Their Attorneys' Fees and Expenses*

Because the Court finds against Pride on its Chapter 93A claim, Pride is not entitled to its attorneys fees pursuant to Section 11 of that statute.

As for CFC's request for attorneys' fees, as already noted, paragraph 6.0 of the Security Agreement and Master Credit Agreements authorizes CFC to collect its attorneys' fees and expenses in connection with its exercise of any rights guaranteed under those agreements. Defendant properly asserted this demand as part of its counterclaim, but the Court heard no evidence or argument on this issue at trial. Defendant has addressed the issue in its Post–Trial Memorandum, but before ruling on it the Court will give Plaintiffs the opportunity to respond. Therefore, Plaintiffs shall have two weeks from the date of this decision within which to respond to the Defendant's demand for attorneys' fees and expenses. Thereafter, the Court will issue a supplementary order on this issue.

---

**45.** 2201. Creation of remedy

(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**46.** Though CFC's demand of a deposit of 1.5% of the outstanding retail contracts, or approximately $250,000, may not have been rooted in an accurate calculation (at worst, the figure was somewhat arbitrary), there is no evidence that it was totally unreasonable or that CFC chose it in order to punish or harm Pride. CFC knew well that Pride's financial difficulties had led to the Recapitalization Agreement in 1999, and was entitled to take measures to protect itself by collateralizing Pride's retail debt.

### III. *Conclusion*

For the foregoing reasons, it is hereby ordered that judgment shall enter against Plaintiffs and in favor of Defendant. Judgment shall also enter declaring that (1) Plaintiffs are required, upon demand, to deposit a reserve amount minimum balance equal to 1.5% of the unpaid balance on all retail contracts purchased by CFC to secure future liabilities to CFC (at the time of trial totaling $187,232.43); [47] and (2) upon liquidation of all outstanding retail contracts, Defendant is required to return any remaining balance to Plaintiffs. The Court reserves judgment at this time on Defendant's request for its attorneys' fees, and grants Plaintiffs two weeks to submit a memorandum to the Court on this subject.

IT IS SO ORDERED

---

47. While the Court will not require Defendant to release the relevant UCC financing statements when Plaintiffs comply with paragraph (1) of the Court's Order, Defendant expressly agreed at trial that CFC would release these UCC filings upon Pride's posting of this security. As stated *supra,* if Defendant refuses to release the UCC filings when Pride complies with paragraph (1), such refusal could well constitute a violation of Chapter 93A.